Royal & Sun Alliance Insurance, PLC v. Ocean World Lines, Inc.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

_____

August Term, 2008

(Argued:    August 5, 2009                    Decided:    July 20, 2010)

Docket Nos. 08-4324-cv (L), 08-4481-cv (XAP)

_____

Royal & Sun Alliance Insurance, PLC

*Plaintiff-Appellant*,

– v. –

Ocean World Lines, Inc.,

*Defendant-Third-Party-Plaintiff-Appellee*,

Yang Ming Marine Transport Corp., Djuric Trucking, Inc.,

*Third-Party-Defendants-Appellees*.[1]

━━━━━━━━━━━━━━━━━━━━━━━━━━━

Before: CALABRESI, B.D. PARKER, and RAGGI, *Circuit Judges*.

In a case involving the applicability of the Carmack Amendment, Royal & Sun Alliance Insurance, PLC appeals the judgment entered by the United States District Court for the Southern District of New York (Hellerstein, *J.*).  Consistent with the Supreme Court's recent holding in *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, --- S.Ct. ---, 2010 WL 2471056 (June 21, 2010), the judgment of the District Court is AFFIRMED.

_____

[1] We direct the Clerk of the Court to amend the official caption as noted.

DAVID L. MAZAROLI, New York, N.Y., *for Plaintiff-Appellant*.

PETER D. CLARK, Clark, Atcheson & Reisert, North Bergen, N.J., *for Defendant-Third-Party-Plaintiff-Appellee*.

JOSEPH DE MAY, JR. (Paul M. Keane, *of counsel*), Cichanowicz Callan Keane Vengrow & Textor, LLP, New York, NY, *for Third-Party-Defendants-Appellees*.

CALABRESI, *Circuit Judge*:

The Supreme Court has recently held that the Carmack Amendment "does not apply to a shipment originating overseas under a single through bill of lading." *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, --- S.Ct. ---, 2010 WL 2471056, at \*8 (June 21, 2010). This Court had previously held otherwise. *See Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.*, 456 F.3d 54, 60-69 (2d Cir. 2006); *see also Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.*, 547 F.3d 351, 355 (2d Cir. 2008). Although *Sompo* was the law of this Circuit at the time of the district court's decision, we now, of course, follow the holding of *Regal-Beloit* and therefore AFFIRM the judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*).

## BACKGROUND

**I.    The Journey of the Printing Press**

In this case, a printing press was shipped on a three-leg journey from Germany to Indiana, and was damaged during the last leg of the journey when the truck carrying the press crashed into an overpass. The five most important entities in this story are:

-2-

1. White Horse Machinery Ltd. ("White Horse"), who is not a party to this case. White Horse was the exporter and shipper of the printing press.

2. Royal & Sun Alliance Insurance, PLC ("Royal & Sun"), who is the Plaintiff-Appellant. Royal & Sun insured White Horse's shipment and became subrogated to its rights.

3. Ocean World Lines, Inc. ("OWL"), who is the Defendant-Third-Party-Plaintiff-Appellee. OWL is the non-vessel-operating common carrier ("NVOCC")[2] that issued a bill of lading to White Horse, promising delivery to the consignee via shipping and carriage that OWL would arrange.

4. Yang Ming Marine Transport Corp. ("Yang Ming"), who is one of the two Third-Party-Defendants-Appellees. Yang Ming, a vessel-operating common carrier ("VOCC"),[3] is the owner of the vessel that took the printing press across the ocean in the first leg of the journey. Yang Ming issued a sea waybill to OWL.

5. Djuric Trucking, Inc. ("Djuric"), who is the other Third-Party-Defendant-Appellee. Djuric is the owner of the truck which carried the printing press during the third leg of the trip, and which crashed into an overpass, damaging the printing press. Djuric did not issue its own bill of lading.

---

[2] "A Nonvessel Operating Common Carrier (NVOCC) by water is one who holds himself or herself out to provide transportation for hire by water in interstate commerce, or in commerce from the United States who assumes or has liability for safe transport and who does not operate the vessel on which the goods are transported. Thus an NVOCC is comparable to a surface freight forwarder who undertakes to deliver the cargo to destination. An NVOCC will issue a bill of lading to the shipper but does not undertake the actual transportation of the cargo. Instead the NVOCC delivers the shipment to an ocean carrier for transportation." 1-1 Saul Sorkin, Goods in Transit § 1.15(8) (footnote omitted).
[3] A vessel-operating common carrier, unlike an NVOCC, does operate its own vessels. *Cf.* 46 U.S.C. § 40102(17) (defining "ocean common carrier" as "vessel-operating common carrier").

## A. The Course of the Shipment

On June 15, 2006, OWL issued a bill of lading[4] to White Horse. The bill of lading described the printing press, and provided that seven packages consisting of the printing press would be shipped from Bremerhaven, Germany, to Bourbon, Indiana. The transport was to be intermodal.[5] OWL, being a NVOCC, is a middleman that does not own and operate its own vessels. Instead, it enters into service contracts whereby it purchases large blocks of cargo space at a discount from vessel-operating common carriers (VOCCs). It then contracts with shippers to ship smaller amounts of cargo in that space. In this particular instance, OWL's bill of lading provided that the shipment would go to Norfolk, Virginia, on the M/V Yang Ming Milano, owned by the VOCC Yang Ming. Final delivery was to be made thereafter in Bourbon, Indiana. On June 16, 2006, the day after OWL's bill of lading was issued to White Horse, Yang Ming issued a sea waybill[6] to OWL. This bill of lading similarly indicated that Yang Ming would take the press from Bremerhaven, Germany to Bourbon, Indiana, by way of the port of Norfolk, Virginia.

On July 5, 2006, Yang Ming arranged for Djuric to pick up the packages in Chicago, Illinois and deliver them to their final destination. The packages arrived in Chicago from Norfolk, having been carried there by the Norfolk Southern Railroad. On

---

[4] "A bill of lading is simply an acknowledgment by a carrier that it has received the goods for shipment. Second, it is a contract of carriage; third, if the bill is negotiated, it controls possession of the goods and is one of the indispensible documents in financing the movement of commodities and merchandise." 1-2 Saul Sorkin, Goods in Transit § 2.01 (footnote and internal quotation marks omitted).

[5] Intermodal transport, also known as multimodal transport, is transport consisting of multiple modes of transport—that is, more than one of truck, rail, sea, and air. 1-3 Saul Sorkin, Goods in Transit § 3.01.

[6] A sea waybill is like a bill of lading, except that bills of lading are negotiable, while waybills are not. *See Sompo*, 456 F.3d at 56 n.4 (citing 1 T. Schoenbaum, Admiralty Law § 10-11 (4th ed. 2006)).

July 6, 2007, a Djuric truck picked up the printing press and subsequently crashed into a bridge overpass, damaging the cargo. Royal & Sun paid White Horse's claim, and sought to recover from OWL its outlay of £63,824.62, which, at the time the complaint was filed, converted to $125,851.38.

### B.     The Bills of Lading

The printing press traveled under the OWL bill of lading and the Yang Ming sea waybill. The terms and circumstances of each are as follows.

#### 1.     The OWL Bill of Lading

The OWL bill of lading, issued on June 15, 2006, contained numerous boilerplate terms, as is typical for bills of lading. First, it included a Clause Paramount, which provided that the transportation would be subject to the $500 per-package liability limitation of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 note.[7] Like most Clauses Paramount, this one extends COGSA beyond the tackle-to-tackle period.[8] Second, Clause 5(D)(3) of the bill of lading provided:

> If COGSA applies then the liability of the Carrier shall not exceed US$500 per package or customary freight unit unless the value of the Goods has been declared on the face hereof with the consent of the Carrier and extra freight has been paid in which case Clause 10 shall apply and the declared value (if higher) shall be substituted for the limit and any partial loss or damage shall be adjusted pro-rata on the basis of such declared value.

---

[7] "A maritime bill of lading in international trade will generally contain a provision often referred to as a Clause Paramount, which states that the bill of lading is subject to the provisions of the Carriage of Goods by Sea Act of the United States." 1-2 Saul Sorkin, Goods in Transit § 2.03(3).

[8] The tackle-to-tackle period is the time between the loading of the goods onto the ship and their discharge from the ship. 1-5 Saul Sorkin, Goods in Transit § 5.13(1)(c). "[R]outine bill of lading clauses explicitly provide for COGSA's application . . . to the times outside of the tackle-to-tackle period." 2A-V Michael F. Sturley, Benedict on Admiralty § 43 (2008); *see also id.* n.5 (collecting numerous cases involving such clauses).

J.A. 82, 88. White Horse, as is typical for most shippers, did not declare the value of the packages; instead, White Horse bought insurance from Royal & Sun.[9]

Third, the OWL bill of lading included what is known as a Himalaya Clause. A Himalaya Clause extends contractual protections that would otherwise apply only to the entity issuing the bill of lading to the subcontractors of the issuing entity as well.[10]

### 2. The Yang Ming Sea Waybill

The Yang Ming sea waybill, accepted by OWL, also contained several terms relevant to this litigation. First, the Yang Ming waybill also had its own Himalaya Clause and Clause Paramount, both rolled into clause 7(1) of the bill:

> [I]n the event that this Bill covers shipments to or from the United States, then COGSA shall be compulsorily applicable and shall (except as may be otherwise specifically provided elsewhere herein) also govern before the Goods are loading [sic] on and after they are discharged from the Vessel provided, however, that the Goods at said times are in the actual custody of the carrier or any Underlying Carrier or Sub-Contractor.

J.A. 183. The waybill defined "Underlying Carrier" as "any water, rail, motor, air or other carrier utilized by the Carrier for any parts of the transportation the shipment [sic] covered by this Bill." *Id.* A "Sub-Contractor" was defined to include "owners and operators of Vessels (other than the Carrier), stevedores, slot chartered owners, terminal and groupage operators, Underlying Carrier, road and rail transport operators and any independent contractor employed by the Carrier in performance of the Carriage." *Id.*

Second, the COGSA $500 per-package limitation was spelled out in clause 23(3):

---

[9] In practice almost all shippers decline to declare a value, because a maritime insurance company is generally willing to assume the risk of loss or damage for a cheaper price than the carrier would be. *See* 3-13 Saul Sorkin, Goods in Transit § 13.16(1)(c).

[10] "A Himalaya Clause is a provision in an ocean carrier's bill of lading which purports to extend to agents and servants of the ocean carrier, and sometimes to others, the defenses and limitations of liability of the ocean carrier provided for in the bill of lading and the Carriage of Goods by Sea Act (COGSA)." 3-14 Saul Sorkin, Goods in Transit § 14.15.

> In the event this Bill covers the Goods moving to or from a port of final destination in the United States, the Carrier's limitation of liability in respect to the Goods shall in no event exceed U.S. dollars $500 per package . . . .

*Id.* Clause 23(4) allowed a shipper to avoid the package limitation by declaring a higher value for the cargo and paying a correspondingly higher rate:

> The aforementioned limitations of liability set forth in this provision shall be applicable unless the nature and value of the Goods have been declared by the Merchant before shipment and agreed to by the Carrier, and are inserted in this Bill and the Applicable "ad valorem" freight rate, as set out in Carrier's Tariff, is paid.

*Id.* OWL did not declare a higher value for the cargo or pay the higher rate.

## II.  Proceedings in the District Court

On April 10, 2007, Royal & Sun, asserting the rights of White Horse by virtue of subrogation, sued OWL in the Southern District of New York, and sought $125,851.38 in damages.  OWL filed its answer on June 29, 2007, and on July 3, 2007, it impleaded Yang Ming and Djuric pursuant to Fed. R. Civ. P. 14(c).  As permitted by Rule 14(c), OWL not only requested contribution and indemnity from Yang Ming and Djuric, but also demanded judgment in Royal & Sun's favor against them.[11]  On December 20, 2007, OWL moved for partial summary judgment on the ground that it could not be liable to Royal & Sun for more than the $500 per-package limitation, or $3500 in total.  The next day, Djuric and Yang Ming moved to dismiss all claims against them on the ground of a forum selection clause in the Yang Ming sea waybill, or, in the alternative, for partial

---

[11] *See* Fed. R. Civ. P. 14(c)(2) ("The third-party plaintiff may demand judgment in the plaintiff's favor against the third-party defendant.  In that event, the third-party defendant must defend under Rule 12 against the plaintiff's claim as well as the third-party plaintiff's claim; and the action proceeds as if the plaintiff had sued both the third-party defendant and the third-party plaintiff.").

-7-

summary judgment on the ground that they were protected by the $500 per-package limitation.[12]

Oral argument on these motions was held before the district court on February 19, 2008. On August 19, 2008, the district court issued an opinion and order that granted OWL's summary judgment motion and denied Yang Ming and Djuric's motion to dismiss, or, in the alternative, for summary judgment. *Royal & Sun Alliance Ins. PLC v. Ocean World Lines, Inc.*, 572 F. Supp. 2d 379 (S.D.N.Y. 2008). The district court held that the liability of OWL, as a NVOCC, was not governed by the Carmack Amendment but rather by COGSA, and that, therefore, the $500 per-package limitation applied as between OWL and Royal & Sun. *Id.* at 396. The court then refused to apply Yang Ming's forum selection clause, holding that Yang Ming could not limit to a particular court Royal & Sun's right to sue. On that basis, the court denied Yang Ming's and Djuric's motion to dismiss. *Id.* at 397. Lastly, the court held that Yang Ming and Djuric, though liable to OWL to the extent of OWL's liability to Royal & Sun, were not otherwise liable to Royal & Sun beyond the $500 per-package limitation. *Id.* at 398-400. Royal & Sun now appeals on the liability limitation issues.[13]

**DISCUSSION**

**I.    Standard of Review**

---

[12] The motion also presented another ground for dismissal of the claims against Djuric—that the Yang Ming bill of lading contained a covenant not to sue Yang Ming's subcontractors. The district court rejected that argument. *See Royal & Sun Alliance Ins. PLC v. Ocean World Lines, Inc.*, 572 F. Supp. 2d 379, 397-98 (S.D.N.Y. 2008). Djuric does not cross-appeal that determination.

[13] Yang Ming and Djuric originally cross-appealed the district court's denial of their motion to dismiss on the forum-selection ground. At oral argument, counsel for those parties agreed that they would withdraw the cross-appeal if we were to hold that the COGSA $500 per-package liability limitation applied to them. Because we so hold, we deem the cross-appeal withdrawn and we do not address it.

We review a district court's grant of summary judgment *de novo*. *E.g.*, *Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009).

**II.     Carmack and Intermodal Through Bills of Lading After *Regal-Beloit***

Royal & Sun advances several arguments on why the Carmack Amendment, 49 U.S.C. § 14706, and not the COGSA $500 per-package limitation, should apply to OWL. In light of *Regal-Beloit*, we readily reject all of these arguments.

**A.     *Regal-Beloit***

In *Regal-Beloit*, the Supreme Court held that the Carmack Amendment "does not apply to a shipment originating overseas under a single through bill of lading." 2010 WL 2471056, at *8. "Carmack applies only to transport of property for which Carmack requires a receiving carrier to issue a bill of lading, regardless of whether that carrier erroneously fails to issue such a bill." *Id.* at *10. There is a two-part test for whether a Carmack bill of lading must be issued:

> First, the rail carrier must "provid[e] transportation or service subject to the jurisdiction of the [STB]." Second, that carrier must "receiv[e]" the property "for transportation under this part," where "this part" is the STB's jurisdiction over domestic rail transport. Carmack thus requires the receiving rail carrier—but not the delivering or connecting rail carrier—to issue a bill of lading.

*Id.* at *8 (quoting 49 U.S.C. § 11706(a)) (alterations in original).

The holding of *Regal-Beloit* is based on the second part of that test:

> [F]or Carmack's provisions to apply the journey must begin with a receiving rail carrier, which would have to issue a Carmack-compliant bill of lading. It follows that Carmack does not apply if the property is received at an overseas location under a through bill that covers the transport into an inland location in the United States. In such a case, there is no receiving rail carrier that "receives" the property "for [domestic rail] transportation," [49 U.S.C.] § 11706(a), and thus no carrier that must issue a Carmack-compliant bill of lading. The initial carrier in that instance

receives the property at the shipment's point of origin for overseas multimodal import transport, not for domestic rail transport.

*Id.* at *10 (second alteration in original).

*Regal-Beloit*'s application of those principles to the facts of *Regal-Beloit* is straightforward. In that case, a VOCC, "K" Line, received cargo in China for intermodal transport to inland destinations in the United States under bills of lading which provided that COGSA would govern the entire journey. "K" Line then subcontracted with the Union Pacific Railroad Company for rail carriage to the final destinations. "K" Line transported the cargo to the port of Long Beach, California, without incident, but Union Pacific's train subsequently derailed in Oklahoma, and allegedly destroyed the cargo. *See id.* at *4-5.

The Court held that Carmack did not apply to "K" Line or to Union Pacific, because neither was a receiving rail carrier for Carmack purposes. "K" Line received the cargo in China for intermodal transport, not in the United States for rail transport. "That 'K' Line chose to use rail transport to complete one segment of the journey under . . . essentially maritime contracts does not put 'K' Line within Carmack's reach and thus does not require it to issue Carmack bills of lading." *Id.* at *10 (internal quotation marks and citation omitted). Union Pacific also was not a receiving rail carrier, for "[a] carrier does not become a receiving carrier simply by accepting goods for further transport from another carrier in the middle of an international shipment under a through bill." *Id.* Rather, "Union Pacific was a mere delivering carrier, which did not have to issue its own Carmack bill of lading." *Id.*

**B.    Carmack Does Not Apply in the Case Before Us**

Applying the holding and principles of *Regal-Beloit*, we conclude that Carmack is inapplicable to OWL, Yang Ming, and Djuric.

As an initial matter, one might ask whether *Regal-Beloit*, which interpreted the version of Carmack that applies to rail carriers, 49 U.S.C. § 11706, must also be followed where, as here (because Djuric is a motor carrier), what is at issue is the version of Carmack that covers motor carriers and freight forwarders, 49 U.S.C. § 14706. We believe that *Regal-Beloit* applies in this context too. The two sentences in § 11706(a) that the Supreme Court interpreted in *Regal-Beloit*, *see* 2010 WL 2471056, at *8-10, are substantially the same as the first two sentences in § 14706(a)(1). The only difference is that they refer to rail carriers instead of motor carriers and freight forwarders.[14] And the policy arguments made by the Court are equally applicable here. The Court says that a contrary result "would in effect outlaw through shipments under a single bill of lading," *id.* at *11, that "[n]one of Carmack's legislative versions have applied to the inland domestic rail segment of an import shipment from overseas under a through bill," *id.* at *12, and that "[a]pplying two different bill of lading regimes to the same through shipment would undermine COGSA and international, container-based multimodal transport," *id.* at *13. The validity of these points does not turn on whether the cargo was

---

[14] *Compare* 49 U.S.C. § 11706(a) ("A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading."), *with* 49 U.S.C. § 14706(a)(1) ("Motor carriers and freight forwarders.—A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 or chapter 105 are liable to the person entitled to recover under the receipt or bill of lading.").

damaged on a truck or on a train. We therefore apply *Regal-Beloit*'s interpretation of §

11706(a) to § 14706(a)(1) as well.

Under *Regal-Beloit*, all three defendants are subject to the $500 liability limitation
of COGSA rather than to Carmack, because none of them "'receiv[ed]' the property 'for
transportation under this part,'" where 'this part' is the STB's jurisdiction over domestic
[motor] transport [and freight forwarders]." 2010 WL 2471056, at *8 (quoting 49 U.S.C.
§ 11706(a)). Djuric, like Union Pacific in *Regal-Beloit*, "was a mere delivering carrier"
rather than the initial carrier. *See id.* at *10. Similarly, Yang Ming and OWL are in the
position of "K" Line in *Regal-Beloit*: they obtained the property "for overseas transport
across an ocean and then to [an] inland destination[] in the United States," and their
decision to use motor transport for one leg of the journey does not render them subject to
Carmack. *Id.*[15]

**III.    Royal & Sun's Contractual Arguments**

---

[15] Royal & Sun argues that all three defendants are "motor carriers" subject to STB jurisdiction as defined in 49 U.S.C. § 13102(14), and that OWL and Yang Ming are "freight forwarders" as defined in 49 U.S.C. § 13102(8). We need not address that contention. Even if we assume *arguendo* that all three defendants are STB-regulated carriers or freight forwarders, only one of the two *Regal-Beloit* requirements for Carmack's applicability would be satisfied. Not only must the defendants a) be STB-regulated carriers or freight forwarders, but b) one of them also must receive the property for domestic transport. *See Regal-Beloit*, 2010 WL 2471056, at *8. As explained above, the latter requirement is not satisfied here. Moreover, although Carmack does provide that "[a] freight forwarder is both the receiving and delivering carrier," 49 U.S.C. § 14706(a)(2), we take this statement to mean only that when a freight forwarder "receives" property for domestic motor or rail transportation within the meaning of § 14706(a)(1), the forwarder is treated as both the receiving and delivering carrier for Carmack purposes. Section 14706(a)(2) does not mean that a freight forwarder, if it plays any role in transport under an intermodal through bill of lading originating across the ocean, is required to issue a Carmack bill of lading. To hold otherwise would be to say that the plaintiff in *Regal-Beloit* would have won, if only it had called "K" Line a freight forwarder. We decline to create such an end run around *Regal-Beloit*.

-12-

In addition to arguing that Carmack applies to the defendants of its own force, Royal & Sun claims that various defendants contracted into Carmack liability. We reject these arguments also.

**A.      OWL Bill of Lading Clause 5(B)(2)**

Royal & Sun first asserts that OWL contracted into Carmack liability by virtue of clause 5(B)(2) of its bill of lading. That clause states that OWL's liability for loss or damage to the cargo shall be determined

> [b]y the provisions contained in any . . . national law, which provisions cannot be departed from by private contract to the detriment of the Merchant, and would have applied if the Merchant had made a separate and direct contract with the Carrier in respect of the particular stage of the carriage where the loss or damage occurred and received as evidence thereof any particular document which must be issued in order to make such . . . national law applicable[.]

J.A. 87. Because its provisions can be departed from by private contract, the Carmack Amendment, however, is not such a national law. *See* 49 U.S.C. §§ 14101(b)(1), 14706(c)(1)(A); *see also Sompo*, 456 F.3d at 59-60 (discussing parties' ability to contract out of the Carmack Amendment in the rail context). OWL, therefore, did not contract into Carmack liability.

**B.      Yang Ming Sea Waybill Clause 7(2)(B)**

Royal & Sun's second contractual argument is that clause 7(2)(B) of Yang Ming's waybill renders Yang Ming subject to Carmack. But clause 7(2)(B) begins with the words, "In the event clause 7(1) is held inapplicable to such Multimodal Transportation." J.A. 183. That is, clause 7(2)(B) applies *only* if clause 7(1), the Clause Paramount, is invalidated. Because no such invalidation has occurred, Yang Ming did not agree to Carmack liability.

**IV. Conclusion**

Having rejected all of Royal & Sun's arguments for Carmack liability, we conclude that the defendants are entitled to the COGSA $500 per-package limitation. Accordingly, we AFFIRM the judgment of the district court.