**AIG EUROPE (NETHERLANDS), N.V., Plaintiff,**

v.

**UPS SUPPLY CHAIN SOLUTIONS, INC., Defendant.**

**No. 08 Civ. 2387(PGG).**

United States District Court, S.D. New York.

Feb. 14, 2011.

David Thomas Maloof, Thomas Mark Eagan, Jacqueline M. James, Maloof Browne & Eagan LLC, Rye, NY, for Plaintiff.

Vincent M. Deorchis, William Edward Lakis, Deorchis, & Partners, LLP, New York, NY, for Defendant.

## MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, District Judge.

Plaintiff AIG Europe (Netherlands), N.V. ("AIG") asserts contract, bailment, and tort claims in this subrogation action against Defendant UPS Supply Chain Solutions, Inc. ("UPS") arising out of damage to an x-ray machine during shipment from the Netherlands to San Angelo, Texas. AIG insured the shipment.

UPS has moved for summary judgment concerning Plaintiff's tort claim, and for partial summary judgment as to liability, arguing that pursuant to the contract between the shipper and UPS, its liability is limited to $9,479.61. AIG has cross-moved for summary judgment, arguing that there was no enforceable agreement between the shipper and UPS as to liability, and that in any event any such limitation provision would be unenforceable under the Carmack Amendment, 49 U.S.C. § 14706(d), and the material deviation doctrine.

The Court's consideration of these motions has been hampered by the parties' failure, in their briefing and supporting affidavits and exhibits, to provide many of the most basic facts concerning the relationship between UPS and the shipper— Philips Medical Systems Nederlands, B.V. ("Philips")—as of March 9, 2004, when the loss occurred. Because the contractual relationship—if any—between UPS and Philips at that time is critical, disputed, and entirely unclear, the parties' motions for summary judgment—except as to Plaintiff's tort claim—will be denied. Defendant's motion for summary judgment concerning Plaintiff's tort claim—which is unopposed—will be granted.

## BACKGROUND

### I. PHILIPS'S REQUEST FOR QUOTE

As best as can be gleaned from the record, it appears that at some point prior to 2004, Philips sent various carriers a Request for Quote ("RFQ").[1] The RFQ seeks information from "logistics providers" who can provide "door to room transportation [and] inside delivery services

---

1. The parties' submissions do not indicate when Philips issued its RFQ, but they agree that the RFQ was issued sometime "prior to 2004." (Pltf. R. 56.1 Stat. ¶ 1; Def. R. 56.1 Stat. ¶ 2)

...." (Pltf. R. 56.1 Stat. ¶ 1;[2] Gill Decl., Ex. 6 at 2) In plain English, Philips appears to have been seeking to select a carrier (or carriers) who could transport or arrange for the transportation of Philips' products from Best, Netherlands, to locations in the United States and Canada. The RFQ seeks extensive information from carriers concerning, *inter alia*, their facilities, operational capabilities, equipment, manpower, quality control, billing, and pricing. (Gill Deck, Ex. 6) The RFQ also asks responding carriers to list their project teams, and key personnel, and to set forth how they "plan to approach implementation (short and medium term) of the operations" to be undertaken for Philips. (*Id.* at 25–26)

The RFQ states that Philips wants the carrier "to manage shipments under Philips transportation contract for both Sea and Airfreight from ... Best[,] Netherlands to customer room in USA or Canada," and envisions that the selected carrier will "arrange and pay for ... Sea freight ... Airfreight and inland haulage." (Gill Decl., Ex. 6 at 5) The RFQ contains a "tentative schedule" providing that (1) the RFQ will be sent out by Philips on November 8, 2002; (2) carriers will respond by November 24, 2002; (3) Philips will select a "short list" of carriers by December 9, 2002; (4) carriers will be required to submit "final rates" by December 13, 2002; and (5) Philips will make a "final decision" concerning its "logistics provider" in January 2003. (Gill Decl., Ex. 6 at 2) Whether any or all of these dates were adhered to is not revealed by the record or addressed by the parties.

Emery Air Freight—which later became Menlo World Wide Logistics ("Menlo"), which in turn was purchased by UPS (collectively, "UPS")—was one of the companies that responded to the RFQ.[3] (Pltf. R. 56.1 Stat. ¶¶ 2, 4; Gill Decl., Ex. 6) UPS's response to Philips' RFQ—which includes both Philips' queries and UPS's answers—consumes forty-three pages. The response is undated and unsigned. In its response to the RFQ, UPS confirms that it can provide the services Philips seeks, including "management of Sea Freight and inland haulage." (Gill Decl., Ex. 6 at 5)

Philips' RFQ contains the following provision concerning liability:

*4.10. Liability*

Please define your company's liability and responsibility with respect to errors, damages, shortages and total loss and your proposals for extended liability. *Our current coverage is $5.00 per pound, per package.*

(*Id.* at 21 (emphasis in original)) UPS (then Emery) responded as follows:

**As noted in the scope of this RFQ, shipments will be moved via air from Best Netherlands to USA and Canada, for K–Van[[4]] distribution throughout the USA and Canada. Shipments moved via air will be subject to Emery's standard Terms and Conditions of Contract, section XVI Limitations of Liability of the attached.**

---

2. Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence. *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003) ("If the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

3. The date of UPS's response to Philips' RFQ is unknown.

4. "K–Van service" is part of a "specialized transportation group" at UPS that handles delivery of sensitive, expensive, and high-tech cargo to a specific building location. (Gill Decl., Ex. 3 (Welsh Tr.) at 67–69, 125–126)

**Emery's K–Van service will honor Philips' current coverage of $5.00 per pound, per package; however, we will require further clarification as to what "errors" will entail.**

(Gill Decl., Ex. 6 at 21 (emphasis in original))

## II. POST–RFQ EVENTS

What happened after Emery submitted its response to Philips's RFQ is entirely unclear. Whether Emery or one of its successors, Menlo or UPS, was selected to serve as Philips' "logistics provider," whether Philips agreed to Emery's proposal in whole or in part, whether the parties engaged in further negotiations concerning, for example, the limitation on liability discussed above, whether Emery or its successors performed services for Philips and, if so, on what terms, is not addressed by the parties and is unknown to this Court.[5] As discussed below, what is clear is that the parties disagree as to whether the RFQ, and Emery's response, constitute a binding contract.

According to the deposition testimony of Steven Holic, Senior Director of Philips Medical Systems's General Purchasing, Forwarding and Distribution Department, no scope of service contract was entered into after Emery submitted its response to the RFQ, but UPS issued a "standard operating procedure document" ("SOP") to Philips concerning the services it would provide:

Q. [W]as there a scope of service contract entered into after this invitation to tender an offer was submitted?

A. Not a scope of service contract. But a scope of service which we call standard operating procedure document.

Q. And the standard operating procedure document, is that something that was—was that in place here?

A. Yes.

(Gill Decl., Ex. 1 (Holic Tr.) at 8, 92)

The SOP, which is dated October 24, 2003, is unsigned, has no effective date, and does not address liability. (Eagan Decl., Ex. B; Gill Decl., Ex. 1 (Holic Tr.) at 92–95) Concerning the services UPS would provide, the SOP states, in part:

3. RESPONSIBILITY OF ORIGIN SERVICE CENTER

. . .

b. Emery Ocean Service is responsible for booking the shipment with Steamship Company, and for transportation to the pier.

. . .

c. Emery Ocean Service will confirm that goods have been received at the pier. . . .

. . .

h. Emery Ocean Service must communicate all pertinent information, and any abnormalities with Philips Best . . . as soon as they are known . . . and the KVAN desk as soon as they are known.

4. RESPONSIBILITY OF KVAN SPECIAL PRODUCTS GROUP

a. KVAN special Products Group will be the primary point of contact for Philips Medical at the United States

---

5. Philips and Menlo—Emery's successor—entered into a formal contract for transportation services in October 2004 (Pltf. R. 56.1 Stat. ¶ 16; Eagan Decl., Ex. F), but the loss here occurred on March 9, 2004. To state the obvious, the parties' rights, duties, and responsibilities as of March 2004 cannot be determined as a matter of law by reference to an October 2004 contract.

and ... will coordinate the activities of the delivery crews, Menlo Worldwide Forwarding, and other entities related to delivery execution.

...

i. KVAN special Products Group will prepare a Delivery order with BTT [trucking company] for pickup of container from Maersk and transportation to hospital delivery site location.

...

j. KVAN Special Products Group will coordinate with the destination gateways as to when the freight will be picked up.

...

n. KVAN Special Products Group will arrange for BTT to be at the hospital site one hour prior to scheduled delivery.

....

(Eagan Decl., Ex. B)

The next event addressed by the parties is a January 19, 2004 e-mail from Philips employee Jeroen Van Nistelrooij to numerous Emery, Menlo and, Philips employees concerning the shipment of a Philips cardiovascular x-ray machine from Best, Netherlands, to the San Angelo Community Hospital in San Angelo, Texas. (Damage to this machine occurred later during transport and provides the basis for this lawsuit.) The e-mail reads as follows:

Dear all,

NEW POTB QUESTIONNAIRE

PO: 702948.

Destination: San Angelo, TX

DELIVERY DATE: 8th of March, 2004.

Attached you'll find another "planned order to Bill questionnaire". By sending you this questionnaire, we ask you to pickup, transport, inside deliver, and un-pack a C/V [cardiovascular x-ray] system, consolidate the packing materials with the materials of at least one other shipment and return them to Best.

With Best Regards,

Jeroen Van Nistelrooij

Operations C/V logistic engineer and Planned order to Bill co-leader

Philips Medical Systems

....

(Eagan Decl., Ex. A)

Whether the parties intended this shipment to be governed by the terms set forth in the RFQ, by the SOP, by a combination of the two documents, or otherwise is not clear. There is no evidence as to Emery/Menlo's response to this e-mail.

In February 2004, UPS "transported" or "arranged for the transportation" of twenty-nine boxes and crates containing the x-ray machine from the Netherlands to the San Angelo Community Hospital in Texas. (Pltf. R. 56.1 Stat. ¶ 17; Def. Resp. to Pltf. R. 56.1 Stat. ¶ 17) The parties dispute whether UPS transported the x-ray machine or merely arranged for its transportation. AIG asserts that UPS hired American President Lines ("APL")—an ocean carrier—to transport the x-ray machine across the Atlantic from Rotterdam to New York. (Eagan Decl., Ex. 7 at 10; Pltf. R. 56.1 Stat. ¶ 19) UPS contends that its "involvement with APL was no more than arranging the transportation [between Rotterdam and New York] as per [the] RFQ." (Def. Resp. to Pltf. R. 56.1 Stat. ¶ 19)

After arrival in New York, BTT—an interstate trucking company—transported the shipment from New York to the parking lot of the San Angelo Community Hospital in Texas. (Pltf. R. 56.1 Stat. ¶ 20; Def. R. 56.1 Stat. ¶ 12) UPS asserts that "Philips selected BTT to provide trucking of the unit to [the] hospital's parking

area." (Def. R. 56.1 Stat. ¶ 12) AIG contends, however, that "Philips recommended BTT—UPS selected them." (Pltf. Resp. to Def. R. 56.1 Stat. ¶ 12)

On March 9, 2004, BTT delivered the x-ray machine to the receiving area of the Texas hospital. (*See* Def. R. 56.1 Stat. ¶ 16) UPS had selected Electran Logistics, part of UPS's "vendor network of companies" (*id.* ¶ 15), to unload the x-ray equipment from the shipping container, transport it into the hospital, and unpack it. (*Id.* ¶¶ 6, 12, 15; Gill Deck, Ex. 1 (Holic Tr.) at 39, 41–43) Mark Korba, an Electran employee, was operating a forklift that day. (Gill Deck, Ex. 2 (Korba Tr.) at 10–13, 32–34) While moving a crate through an inclined parking lot to the receiving area of the hospital, Korba was required to raise the blades of the forklift in order to create ground clearance for the cargo while moving uphill. (*Id.* at 27–28) In carrying one component of the x-ray machine—which weighed 861 kilograms (Def. R. 56.1 Stat. ¶ 50)—Korba raised the forklift's blades to drive up the incline. (Gill Decl., Ex. 2 (Korba Tr.) at 27–28, 32–34) While doing so, the forklift unexpectedly "lurched" forward and the crate toppled over, causing significant damage to a component of the x-ray machine. (*Id.* at 32–34)

AIG brings this action as Philips' subrogee, asserting claims for breach of contract, breach of bailment obligations, and tort. (Def. R. 56.1 Stat. ¶¶ 53, 54) UPS has moved for summary judgment, arguing that the $5.00 per pound liability limitation mentioned in the RFQ governs, and that its liability for damage to the x-ray equipment is thus limited to $9,479.61. (Docket No. 17) AIG has filed a cross-motion for summary judgment, seeking damages of $199,139.14 for the damaged x-ray component. (Docket No. 22)

## DISCUSSION

### I. LEGAL STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "The movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.2008). In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. General Elec. Co.*, 252 F.3d 205, 216 (2d Cir.2001). However, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)).

▮▮▮ The RFQ and the SOP contain no choice of law provision (*see* Gill Decl., Ex. 6; Eagan Decl., Ex. B), and the parties have not addressed what jurisdiction's law applies to the question of whether an enforceable contract existed between Philips and UPS's predecessors. The factual record is likewise not sufficiently developed to permit this Court to perform a choice-of-law analysis. However, "the Court need not 'embark on a choice-of-law analysis in the absence of an actual conflict between the applicable rules of [the] rele-

vant jurisdictions.'" *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ 318(RJS), 2009 WL 2242605, at *19 (S.D.N.Y. July 27, 2009) (quoting *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir.2005)). Moreover, where the parties' "briefs assume that New York law controls, . . . such 'implied consent . . . is sufficient to establish choice of law.'" *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ 318(RJS), 2009 WL 2242605, at *19 n. 14 (S.D.N.Y. July 27, 2009) (quoting *Nat'l Utility Serv., Inc. v. Tiffany & Co.*, No. 07 Civ. 3345(RJS), 2009 WL 755292, at *6 n. 6 (S.D.N.Y. Mar. 20, 2009)); *see also Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F.Supp.2d 329, 336–37 (S.D.N.Y.2006) ("[A choice of law] analysis is unnecessary because the parties' briefs assume that New York law controls and such implied consent . . . is sufficient to establish choice of law." (internal citations and quotations omitted)).

Here, neither UPS nor AIG contends that there is an "'actual conflict between the applicable rules of [the] relevant jurisdictions.'"[6] *See DeBlasio*, 2009 WL 2242605, at *19 (quoting *Fin. One Pub.*, 414 F.3d at 331). Moreover, the parties cite to New York law and assume that New York law controls as to this issue. (*See* Def. Resp. to Pltf. R. 56.1 Stat. ¶ 10; Def. Reply Br. 8; Pltf. Br. at 23–27) Accordingly, this Court will apply New York law for purposes of determining whether it can rule as a matter of law that an enforceable contract existed between Philips and UPS's predecessors.

Under New York law,

[e]xistence of a contract requires "an offer, acceptance, consideration, mutual assent and intent to be bound." *Benicorp*, 447 F.Supp.2d at 337. Mutual as-

sent requires, in turn, "a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract." *Id.* Indeed, "[i]f the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract." *Id.* (citing *Schurr v. Austin Galleries of Illinois, Inc.*, 719 F.2d 571, 576 (2d Cir.1983)).

*Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F.Supp.2d 384, 396–97, 2011 WL 118245, at *9 (S.D.N.Y. Jan. 12, 2011).

■ "Whether a contract is unambiguous is a question of law to be resolved by the Court." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 148–49 (2d Cir.1993). Contract language is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir.2000) (quotation omitted); *accord Trustees of the Four Joint Bds. Health & Welfare & Pension Funds v. Penn Plastics, Inc.*, 864 F.Supp. 342, 345 (S.D.N.Y. 1994).

In order "[t]o determine the terms of a contract[,] a court must ascertain the parties' intent based on the language they used." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985)). The Second Circuit has noted that

[i]nterpreting [an] agreement requires consideration as to whether any terms of that agreement are ambiguous. . . . An

---

**6.** Indeed, the basic contract formation principles discussed below likely apply across all relevant jurisdictions.

ambiguous term is one about which reasonable minds could differ. *See Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992); *Care Travel Co. v. Pan American World Airways, Inc.*, 944 F.2d 983, 988 (2d Cir.1991); *Van Wagner Advertising*, 67 N.Y.2d 186, 501 N.Y.S.2d 628, 492 N.E.2d 756 [ (1986) ]. *Consarc Corp.*, 996 F.2d at 573.

■ "Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning— each as reasonable as the other—and where extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact." *Id.* (citing *Seiden Assocs.*, 959 F.2d at 428); *see also Fershtadt v. Verizon Commc'ns Inc.*, No. 07 Civ. 6963(CM), 2010 WL 571818, at *12 (S.D.N.Y. Feb. 9, 2010) (" '[W]hen the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for [the fact-finder] to resolve, thereby precluding summary judgment.' " (quoting *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir.2001))).

## II. WHETHER AN ENFORCEABLE AGREEMENT EXISTED BETWEEN PHILIPS AND UPS CANNOT BE RESOLVED AS A MATTER OF LAW

■ In order to resolve whether UPS's liability for damage to the x-ray machine is limited to $5.00 per pound, as UPS argues in its summary judgment motion, the Court must determine, *ab initio*, whether Philips and UPS entered into an enforce-

able agreement concerning this liability limitation. AIG asserts that the RFQ "was not a final contract or agreement between the parties" (Pltf. Resp. to Def. R. 56.1 Stat. ¶¶ 2–3), and that the RFQ "negotiations never resulted in a final contract being executed." (Pltf. R. 56.1 Stat. ¶ 11; *see also* Pltf. R. 56.1 Stat. ¶ ¶ 10 ("there is no evidence that at any time prior to the movement of the shipment at issue Philips and Menlo actually executed a binding contract incorporating firmly agreed upon liability terms or clarifying what 'errors' would be covered, as proposed in Emery's response to the RFQ"); Pltf. Resp. to Def. R. 56.1 Stat. ¶ 45 ("[t]he RFQ was not an agreement")). UPS contends, however, that it performed pursuant to this "written agreement" (Def. Br. 1), that there was an "agreed [liability] limitation [of] $5.00 per pound," and that "[t]he limitation was expected and enforceable through performance pursuant to the RFQ."[7] (Def. Resp. to Pltf. R. 56.1 Stat. ¶ 10) Because there are genuine issues of material fact as to whether Philips and UPS entered into an enforceable agreement, the parties' motions for summary judgment must be denied.

### A. The Language of the RFQ

As an initial matter, the RFQ is unsigned and undated, and nothing in it suggests that Philips is offering to be bound by a $5.00 per pound liability limitation. The liability provision of the RFQ reads as follows:

*4.10. Liability*

Please define your company's liability and responsibility with respect to errors,

---

**7.** AIG is an insurer-subrogee, and "stands in the shoes" of Philips, its insured. *See Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 106 (2d Cir.1992). Thus, AIG is subject to whatever defenses UPS would have had against Philips. *See Great Am. Ins. Co. v. United*

*States*, 575 F.2d 1031, 1034 (2d Cir.1978) ("[Subrogation] is an exclusively derivative remedy which depends upon the claim of the insured and is subject to whatever defenses the tortfeasor has against the insured.").

damages, shortages and total loss and your proposals for extended liability.

*Our current coverage is $5.00 per pound, per package.*

(Gill Decl., Ex. 6, at 21 (emphasis in original)) Philips's language merely notifies the party responding to the RFQ what Philips's current liability coverage is.

Emery, UPS's predecessor, indicates a willingness to perform subject to the coverage Philips already has, but its response makes clear that further negotiation will be necessary before an agreement can be reached as to this term:

> **Emery's K–Van service will honor Philips' current coverage of $5.00 per pound, per package; however, we will require further clarification as to what "errors" will entail.**

(Gill Decl., Ex. 6, at 21 (emphasis in original))

AIG asserts that "there is no evidence that at any time prior to the movement of the shipment at issue Philips and Menlo actually executed a binding contract ... clarifying what 'errors' would be covered" (Pltf. R. 56.1 Stat. ¶ 10), and that "the parties never defined which 'errors' would lead to liability." (*Id.* ¶ 12) UPS does not offer any evidence demonstrating that the parties ever reached agreement concerning "which errors would lead to liability," much less that they executed an agreement prior to the March 9, 2004 damage to the x-ray machine.

Based on the language of Philips's RFQ and Emery's response, this Court cannot find that the parties reached agreement concerning a liability limitation. To the extent that UPS argues that the parties' intent to be bound can be established through extrinsic evidence, that issue must be presented to a jury. *See Consarc Corp.*, 996 F.2d at 573; *Fershtadt*, 2010 WL 571818, at *12.

### III. *PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT BASED ON THE CARMACK AMENDMENT WILL BE DENIED*

█ AIG has cross-moved for summary judgment, contending that—even if the parties had agreed to a $5.00 per pound liability limitation—the Carmack Amendment governs the shipment at issue and any such liability limitation would be unenforceable. There are genuine issues of material fact as to whether UPS was acting as a carrier or as a broker here, however, and therefore the applicability of the Carmack Amendment cannot be determined as a matter of law.

### A. *Statutory Framework*

The Carmack Amendment to the Interstate Commerce Act of 1887 governs the liability of motor carriers for loss or damage to goods transported in interstate commerce. *See* 49 U.S.C. § 14706(d). "In enacting it, Congress intended to provide interstate carriers with reasonable certainty and uniformity in assessing their risks and predicting their potential liability." *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 73 n. 6 (2d Cir.2001) (citing *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 381 (5th Cir.1998); *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 704 (4th Cir.1993)). The purpose of Carmack is to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *See Reider v. Thompson*, 339 U.S. 113, 119, 70 S.Ct. 499, 94 L.Ed. 698 (1950). "The Carmack Amendment did this both by establishing a single uniform regime for recovery by shippers 'directly from [the] interstate common carrier in whose care their [items] are damaged,' and by 'preempt[ing] [the] shipper's state and

common law claims against a carrier for loss or damage to goods during shipment.'" *Project Hope*, 250 F.3d at 73 n. 6 (quoting *Windows, Inc. v. Jordan Panel Sys. Corp.*, 177 F.3d 114, 117–18 (2d Cir. 1999); *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 138 (4th Cir.2000)). "Carmack effectively codified the strict liability rule that governed the liability of common carriers at common law." *Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.*, 456 F.3d 54, 59 (2d Cir.2006) (citing *Missouri Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964)), *abrogated on other grounds by Kawasaki Kisen Kaisha Ltd. v. Regal–Beloit Corp.*, —— U.S. ——, 130 S.Ct. 2433, 2440, 177 L.Ed.2d 424 (2010).

Where the Carmack Amendment applies, "[i]n an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages." *Missouri Pac. R.R. Co.*, 377 U.S. at 137–38, 84 S.Ct. 1142; *accord Project Hope*, 250 F.3d at 73 n. 6. Once a shipper makes this showing, a carrier seeking to avoid liability must demonstrate that the damage was caused not by negligence but "by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *See Missouri Pac. R.R. Co.*, 377 U.S. at 137, 84 S.Ct. 1142 (1964) (citing *Chesapeake & O. Ry. Co. v. A.F. Thompson Mfg. Co.*, 270 U.S. 416, 421–423, 46 S.Ct. 318, 70 L.Ed. 659 (1926); *Adams Express Co. v. Croninger*, 226 U.S. 491, 509, 33 S.Ct. 148, 57

L.Ed. 314 (1913); *Hall & Long v. Nashville & C.R. Co.*, 80 U.S. (13 Wall.) 367, 372, 20 L.Ed. 594 (1871)) (internal quotations omitted).

After "liability under the Carmack Amendment has ... been established, '[t]he inquiry then becomes the amount of damages and, usually, whether the carrier legitimately limited its liability for the shipment to a specified value or amount.'" *St. Paul Fire & Marine Ins. Co. v. Schneider Nat'l Carriers, Inc.*, No. 03 Civ. 5197, 2006 WL 522455, at *7 (S.D.N.Y. Mar. 3, 2006) (quoting *A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003)). Under the "reasonable opportunity" doctrine, in order to properly limit its liability under the Carmack Amendment, a carrier must give the shipper a reasonable opportunity to choose between two or more levels of liability. *See Travelers Indem. Co. of Ill. v. Schneider Specialized Carriers, Inc.*, No. 04 Civ. 5307, 2005 WL 351106, at *5 n. 4 (S.D.N.Y. Feb. 10, 2005) (citing *Rohner Gehrig Co., Inc. v. Tri–State Motor Transit*, 950 F.2d 1079, 1081 (5th Cir.1992) (*en banc*); *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir.1987), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248).

### B. *Applicability of the Carmack Amendment* [8]

#### 1. *Distinction Between "Carrier" and "Broker"*

As a threshold matter, the "Carmack amendment imposes liability on 'carriers'

---

**8.** The Supreme Court recently held that the Carmack Amendment does not apply to an inland rail segment of a shipment originating overseas under a single through bill of lading. *Kawasaki Kisen Kaisha Ltd. v. Regal–Beloit Corp.*, —— U.S. ——, 130 S.Ct. 2433, 2442, 2449, 177 L.Ed.2d 424 (2010). While *Regal–*

*Beloit* involved rail rather than motor transport, Carmack applies regardless of the particular mode of transport. *See Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 145 (2d Cir.2010) (noting that *Regal–Beloit* applies to rail and motor carriers because the statutory language is substantially

but not on 'brokers,' as those terms are defined by the statute," and thus "it is critical to determine whether a defendant was acting as a carrier or as a broker in relation to the particular shipment that was damaged." *AIOI Ins. Co. v. Timely Integrated, Inc.,* No. 08 Civ. 1479, 2009 WL 2474072, at *2 (S.D.N.Y. Aug. 12, 2009). "The difference between a carrier and a broker is often blurry." *Nebraska Turkey Growers Coop. Assoc. v. ATS Logistics Servs., Inc.,* No. 4:05CV3060, 2005 WL 3118008, at *4 (D.Neb. Nov. 22, 2005) (citing *Delta Research Corp. v. EMS, Inc.,* No. 04–60046, 2005 WL 2090890, at *5 (E.D.Mich. Aug. 29, 2005)). Here, this Court cannot determine as a matter of law whether UPS's role in the shipment was as a carrier or as a broker.

Under the statute, a "broker" is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

In contrast, a "motor carrier" is "a person providing commercial motor vehicle ... transportation for compensation." *Id.* § 13102(14).

The implementing regulation provides that

[m]otor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

*See* 49 C.F.R. § 371.2(a).

Courts routinely deny summary judgment where there are issues of fact as to whether an entity is a carrier. *See, e.g., Consol. Freightways Corp. of Del. v. Travelers Ins. Co.,* No. 00–CV–20726, 2003 WL 22159468, at *6 (N.D.Cal. Mar. 28, 2003) (finding summary judgment inappropriate because triable issues of fact remained as to whether trade show producer was a carrier or merely a broker when it arranged for transportation and also performed some transportation functions, was listed as the carrier on one of the shipping forms, and sent a letter thanking the shipper for "selecting GES Logistics to handle the transportation needs"); *Hewlett–Packard Co. v. Brother's Trucking Enterprises, Inc.,* 373 F.Supp.2d 1349, 1352 (S.D.Fla. 2005) (denying summary judgment because reasonable fact finder could find that the defendant acted as either motor carrier or broker where the defendant both arranged for transportation and also exerted some measure of control over the drivers); *Just Take Action, Inc. v. GST (Americas) Inc.,* No. 04–3024 ADM/RLE, 2005 WL 1080597, at *5 (D.Minn. May 6, 2005) (denying summary judgment because triable issues of fact existed as to whether the defendant played "the role of broker or motor carrier in shipping the

---

similar and the policy arguments are equally applicable); *see also Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.,* 456 F.3d 54, 59 (2d Cir.2006), *abrogated on other grounds by Kawasaki Kisen Kaisha Ltd. v. Regal–Beloit Corp.,* —— U.S. ——, 130 S.Ct. 2433, 2440, 177 L.Ed.2d 424 (2010) ("Carmack's applicability[ ] is identical regardless of the mode of transport." (citing *Project Hope,* 250 F.3d at 75)).

After the Supreme Court issued its decision in *Regal–Beloit,* this Court ordered the parties to submit supplemental briefing regarding its effect on this case. (*See* Docket No. 36) Both sides agree that Regal–Beloit is not applicable, because there was no through bill of lading here. (*See* Pltf. Sep. 27, 2010 Ltr. at 1–2; Def. Sep. 27, 2010 Ltr. at 1–2)

fermenter tanks" when it arranged for transportation with a separate motor carrier but also "drafted the bill of lading and directed how the shipment would take place").

## 2. *Analysis*

UPS argues that the Carmack Amendment does not apply here because it did not act as a carrier, but merely "arranged for" delivery of the x-ray equipment from the Netherlands to the Texas hospital. (Def. Reply Br. at 4, 7) UPS further argues that it was never legally bound to transport the x-ray machine, that its employees or agents never touched the shipment until it arrived at the hospital parking lot in Texas, and that even then UPS employees or agents only performed an intrastate "switching service" between the parking lot and the hospital.[9] AIG argues, however, that UPS acted as a carrier by, *inter alia,* controlling the shipment throughout the transportation process, providing transportation services, and transporting the equipment.[10] (Pltf. Reply Br. at 3–6)

This Court concludes that there are genuine issues of material fact as to whether UPS was "providing commercial motor vehicle ... transportation for compensation." *See* 49 U.S.C. § 13102(14). Similarly, under the implementing regulation, there are genuine issues of material fact as to whether UPS was authorized and legally bound to transport the x-ray machine. *See* 49 C.F.R. § 371.2(a).

AIG has offered evidence that UPS provided, and was legally bound to provide, transportation of the x-ray equipment. AIG argues that in responding to the RFQ, UPS agreed to provide "all door to room transportation services and inside delivery" for Philips's cargo (Pltf. R. 56.1 Stat. ¶ 1) and that UPS agreed to "transport [Philips's] freight according to [Philips's] specific guidelines." (*Id.* ¶ 3) AIG also cites Philips's January 19, 2004 e-mail to Emery and Menlo, in which Philips requested these companies "to pickup, transport, inside deliver and unpack [the x-ray equipment]." (*Id.* ¶ 2; *see also* Eagan Decl., Ex. A) AIG also offers Philips's February 16, 2004 invoice listing "Emery" as the "Mode of transport." [11] (Eagan Decl., Ex. G at 1)

UPS has offered evidence, however, that it was obligated "only to monitor for potential delays—to 'watch' the shipment" (Def. R. 56.1 Stat. ¶ 10), and that it did not "even see ... the product on an ocean ship until it actually [arrived at] the hospital." (Gill Decl., Ex. 3 (Welsh Tr.) at 62) UPS also offers testimony from the UPS manager overseeing the delivery at San Angelo stating that Philips directed all aspects of the inland transportation:

Philips selected BTT to provide the inland transportation. There were a cou-

---

**9.** Citing 49 U.S.C. § 14706(a)(1), UPS asserts that "[u]nder Carmack, a 'delivering carrier is deemed to be the carrier performing the line haul transportation nearest the destination, but[ ] *does not* include a carrier providing only switching service at the destination.'" (Def. Reply Br. at 4–5 (quoting 49 U.S.C. § 14706(a)(1) (emphasis in original))) The significance of this distinction here is not explained and is not apparent.

**10.** In its supplemental September 27, 2010 letter brief concerning the Supreme Court's *Regal–Beloit* decision, AIG argues for the first time that—regardless of Carmack's applica-

bility—UPS's limited liability argument fails under federal common law. (Pltf. Sep. 27, 2010 Ltr. Br. 4) Having not made this argument in its moving brief and reply brief, AIG cannot raise it now, particularly given that the Court requested supplemental briefing concerning only the applicability of *Regal–Beloit* and its Second Circuit progeny. (*See* Docket No. 36)

**11.** AIG has not argued that the October 24, 2003 UPS SOP (Eagan Decl., Ex. B) constitutes an enforceable agreement between the parties.

ple of other trucking companies that haul ocean containers that Philips had contracts with, and ... they told us these were the carriers that they were going to use to deliver the container to the hospital.... Philips had negotiated pricing and services with these ... companies and they basically directed us ... that this one would be delivered by BTT.... Philips set that whole thing up. Philips negotiated the whole process with those inland haulers. We had nothing to do with it.... Philips took care of [the inland trucking].

(Gill Decl., Ex. 4 (Whitrock Tr.) at 50–52, 121; Ex. 5 (Whitrock Decl.)) According to UPS, it did not exercise control over the transportation but acted merely as an arranger of the haulage, such that the Carmack Amendment does not apply and any liability limitation agreement entered into between the shipper and UPS is enforceable. (Def. Reply Br. 4) Because there are material issues of fact as to whether UPS was acting as a "carrier" or as a "broker" within the meaning of the Carmack Amendment, AIG's motion for summary judgment will be denied.[12]

## IV. THE APPLICABILITY OF THE MATERIAL DEVIATION DOCTRINE CANNOT BE DETERMINED AS A MATTER OF LAW

██ AIG argues that UPS's alleged failure to utilize cargo straps, extended forks, and a trained forklift operator in delivering the x-ray machine constitutes material deviations from the parties' agreement, thus invalidating the liability limitation clause. (Pltf. Br. 17–19)

██ Under the material deviation doctrine, when a carrier breaches a material provision of its contract with the shipper, a clause limiting liability will not prevent the shipper's recovery, because the deviation justifies rescission of the entire carriage contract. See Rocky Ford Moving Vans, Inc. v. United States, 501 F.2d 1369, 1372 (8th Cir.1974); The Sarnia, 278 F. 459, 463 (2d Cir.1921) ("It has long been established law that a deviation changes the character of a voyage so essentially that the shipowner who has deviated cannot claim the benefit of the terms of the bill of lading.").

Here, for the reasons stated above, it cannot be determined as a matter of law what agreement, if any, governed the shipment at issue. Accordingly, this Court cannot determine as a matter of law whether UPS materially deviated from its alleged agreement with Philips in transporting the x-ray equipment from the parking lot into the hospital.[13]

## V. UPS IS ENTITLED TO SUMMARY JUDGMENT ON AIG'S TORT CLAIM

UPS has moved for summary judgment as to AIG's tort claim, arguing that it is

12. UPS argues that AIG's claim is time-barred under the Carmack Amendment's statute of limitations. (Def. Reply Br. 7) Because the applicability of the Carmack Amendment cannot be determined as a matter of law, the Court does not reach this issue.

13. There are likewise material issues of fact as to whether Philips requested a trained forklift operator, cargo straps, and extended forks. For example, UPS offers a declaration from its manager stating that Philips never requested extended forks (Gill Decl., Ex. 5 at

1), while AIG offers a Direct Delivery Questionnaire in which Philips requests extended forks and cargo straps. (Gill Decl., Ex. 5 (Whitrock Decl. Ex. 1); Def. R. 56.1 Stat. ¶ 44) There are also issues of fact as to whether Korba, the forklift operator, was properly trained. At his deposition, Korba denied receiving any formal training (Gill Decl., Ex. 2 (Korba Tr.) at 57–58), but Korba's co-worker offered a declaration stating that both he and Korba were properly trained. (Gill Decl., Ex. 10 (Henry Decl.))

time-barred. AIG "does not oppose" UPS's motion. (Pltf. Br. 1 n. 2) Accordingly, UPS's motion for summary judgment as to the tort claim will be granted.

## CONCLUSION

For the reasons stated above, Defendant UPS's motion for summary judgment (Docket No. 17) is granted as to Plaintiff's tort claim but otherwise denied. Plaintiff AIG's cross-motion for summary judgment (Docket No. 22) is denied. The Clerk of the Court is directed to terminate the motions.

The parties are directed to consult and comply with Rule 9 of this Court's Individual Rules with respect to submission of a joint pretrial order within 30 days of this decision.

SO ORDERED.