### TRANSATLANTIC MARINE CLAIMS AGENCY, INC., Plaintiff–Appellee,

v.

### M/V "OOCL INSPIRATION," her engines, boilers, etc., Defendant,

### Oriental Overseas Container Line (Uk) Ltd.; Sea–Land Services, Inc., Defendants–Appellants.

Nos. 766, 767, Dockets 97–7581, 97–7589.

United States Court of Appeals, Second Circuit.

Argued Oct. 23, 1997.

Decided Feb. 17, 1998.

Alexander Peltz, Peltz and Walker, New York City (Stephen Spicer, on the brief), for Plaintiff–Appellee.

Thomas L. Tisdale, Tisdale & Associates, New York City, (Christopher M. Hanrahan, of counsel), for Defendant–Appellant Orient Overseas Container Line (UK) Ltd.

M.E. DeOrchis, DeOrchis Walker & Corsa, LLP, New York City, (John A. Orzel, of counsel), for Defendant–Appellant Sea–Land Services, Inc.

Before: NEWMAN, ALTIMARI, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

This action is an appeal by defendants-appellants Orient Overseas Container Line (UK) Ltd. ("OOCL") and Sea–Land Services, Inc. ("Sea–Land") from a summary judgment entered in favor of plaintiff-appellee Transatlantic Marine Claims Agency, Inc. ("TMCA"). With the exception of its decision that Sea–Land's tariff (rather than OOCL's tariff) should limit the plaintiff's recovery, we affirm the judgment of the district court.

The plaintiff is the agent for an insurer with a subrogation interest in the claims of the shipper, Sibille Dalle, Inc., for damages to goods shipped by sea aboard the M/V OOCL Inspiration.[1] (Despite her name, the Inspiration is part of Sea–Land's fleet, not OOCL's.) The action was brought under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. § 1300 *et seq.*

OOCL and the shipper executed a bill of lading to transport 367 rolls of printing paper from Stenay, France, to various points in the United States.[2] The paper was shipped by container method; in other words, the rolls were carried in 26 sealed containers. OOCL, pursuant to a Space Charter and Sailing Agreement (the "VSAO Agreement") with Sea–Land, arranged for ocean transport of the containers from Antwerp to Charleston aboard one of Sea–Land's vessels, specifically, the Inspiration.

On March 25, 1994, OOCL received from the shipper the sealed containers at Stenay and issued a clean bill of lading.[3] OOCL, either by itself or through a third party (the record is unclear), transported the containers from Stenay to the port at Antwerp, Belgium. In Antwerp, the containers were loaded onto the Inspiration. The Inspiration promptly sailed (apparently stopping in England on the way) to Charleston, South Carolina. At Charleston, the containers were off-loaded and stored at port from April 7 to May 17. They were then sent by truck and/or rail to various final destinations in Tennessee. Upon arrival, 43 rolls of paper were discovered to have suffered "wetting," which experts for both the shipper and OOCL concluded resulted from sea water.[4] The rolls were sold for salvage, and the cargo underwriter paid the shipper for the full loss. TMCA was then authorized to pursue the

---

1. Sea-Land's contention that TMCA is not a party in interest is without merit. When this argument was first raised, TMCA offered to show ratification of its interests by the cargo owner. This was neither deemed necessary by the district court nor demanded by either defendant-appellant.

2. The precise scope of the Bill of Lading is contested. *See infra* note 7.

3. Because the containers were pre-sealed, the clean bill was issued using the language "said to contain" good rolls of paper. Such bills establish "apparent good order and condition." *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 103 & n. 4 (2d Cir.1977) (resolving a heated debate about yarn packaging). Although a clean bill of lading ordinarily establishes a presumption under COGSA of delivery in good condition, *see Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 352 (2d Cir.1981), we have noted that "[c]lean on-board bills of lading of packaged goods ... merely attest to the *apparent* good condition of the cargo based upon external inspection." *Id.* at 353–54 n. 5 (emphasis added). Thus the clean-bill-of-lading presumption of delivery in good condition is qualified in containerization and other such cases where an inspection on issuance of the bill is necessarily limited.

4. Sea-Land's curious claim that it was somehow prejudiced by not being allowed to send its own expert (in addition to OOCL's) to inspect the damage is a red herring. The district court did not err in finding that, given the agreement by OOCL's and TMCA's experts, there was no basis for speculating about any other form of damage.

subrogation interest of the underwriter in this action.

The district court (Robert W. Sweet, *Judge*) concluded that TMCA had made out a prime facie case under COGSA that went unrebutted by either defendant. *See Transatlantic Marine Claims Agency, Inc. v. M/V "OOCL Inspiration"*, 961 F.Supp. 55 (S.D.N.Y.1997). It also held that Sea–Land's tariff applied to the transport. It therefore entered summary judgment against defendants and denied their cross motions for summary judgment. Defendants now appeal these rulings on various grounds.

*The COGSA Prime Facie Case*

▮ Appellants' first claim is that the district court erred in ruling that the plaintiff made out a prima facie case under COGSA. In a COGSA cause of action, a shipper "who wishes to recover against the carrier for damage to goods bears the initial burden of proving both delivery of goods to the carrier ... in good condition, and outturn by the carrier ... in damaged condition." *Vana Trading*, 556 F.2d at 104;[5] *see also* COGSA, 46 U.S.C. app. §§ 1303–04. Once the plaintiff has made out a prima facie case, however, the burden shifts to the defendant(s) to show that one of the statutory COGSA exceptions to liability exists. *See id.* § 1304(2). COGSA's framework thus places the risk of non-explanation for mysterious maritime damage squarely on defendants:

> To rebut the presumption of fault when relying upon its own reasonable care, the carrier must further prove that the damage was caused by something other than its own negligence. Once the shipper establishes a prima facie case, under "the policy of the law" the carrier must "explain what took place or suffer the consequences." "[T]he law casts upon [the carrier] the burden of the loss which he cannot explain or, explaining, bring within the

exceptional case in which he is relieved from liability."

*Associated Metals & Minerals Corp. v. M/V Arktis Sky*, 978 F.2d 47, 51 (2d Cir.1992) (quoting *Quaker Oats Co. v. M/V Torvanger*, 734 F.2d 238, 243 (5th Cir.1984) (citations omitted)) (alterations in original).[6]

▮ In short, the statutory scheme, (1) clearly evinces an intent to hold carriers prima facially liable for damage to goods at sea, *see id.* at 52 ("There should be little dispute that the purpose of COGSA is to place primary responsibility for the safety of the cargo upon the vessel, its operators and owners."), but under it, (2) the initial burden of persuasion falls on the plaintiff to make out a prima facie case that the goods were, indeed, damaged while in the defendant's care. There are, moreover, two general ways a plaintiff can make out such a prima facie case under COGSA.

First, the plaintiff may present direct evidence relating to the healthy condition of the goods at delivery and their damaged condition at outturn. In this respect, our caselaw and the statute itself have outlined various presumptions that may be relied upon by both plaintiffs and defendants. For example, the issuance of a clean bill of lading creates a presumption of delivery in good condition favorable to the plaintiff. *See supra* note 3. Conversely, a consignee who does not give notice of damage within three days of receipt is burdened by a presumption of arrival in good condition. *See* 46 U.S.C. app. § 1303(6); *Bally, Inc. v. M.V. Zim*, 22 F.3d 65, 71 (2d Cir.1994).

▮ Within this structure, second-order evidentiary disputes may take place (for example, whether notice was received on the third or fourth day) concerning the various COGSA presumptions. While different burdens with respect to these intermediate dis-

---

5. *Cf. Caemint Food*, 647 F.2d at 354 (Friendly, *J.*) ("It is fair to impose on the plaintiff the burden of showing the condition of packaged goods on delivery because the shipper has superior access to information as to the condition of the goods when delivered to the carrier, just as the carrier has superior access to information as to what happened thereafter.") (internal quotation marks and citations omitted).

6. If the defendant is able to show one of the COGSA exceptions, the burden returns to the plaintiff, where plaintiff may still prevail by showing exceptions to the exceptions—for example "concurrent causes" for loss. *See Vana Trading*, 556 F.2d at 105–06.

putes are varyingly placed on the plaintiff and the defendant, in the end, the risk of non-persuasion remains on the plaintiff. This is so because "[t]he shipper has [the ultimate] burden on the issue whether the goods were damaged while in the carrier's custody." *Caemint Food,* 647 F.2d at 354 (internal quotation marks and citation omitted).

The second way a plaintiff may discharge its burden of making out a prima facie case under COGSA is to show that the characteristics of the damage suffered by the goods· justify the conclusion that the harm occurred while the goods were in the defendant's ·custody. As we have made clear, "the consignee's burden does not mean that it must always introduce direct evidence that the cargo was in good condition when shipped. It may additionally meet its burden by showing, as was also done here, *from the condition of the cargo as delivered or otherwise, that the damage was caused by the carrier's negligence and not by any inherent vice in the cargo.*" *Vana Trading,* 556 F.2d at 105 n. 8 (citing *Elia Salzman Tobacco Co. v. S.S. Mormacwind,* 371 F.2d 537, 539 (2d Cir. 1967)) (emphasis added).

This second avenue is available because not infrequently a plaintiff who is unable to provide specific evidence as· to the condition of the goods at delivery or outturn, can nonetheless show, by the nature of the damage, that the injury complained of happened to the cargo while it was in the carrier's custody. And the whole point of the prima facie requirements in COGSA, as our cases have repeatedly emphasized, is to establish that the damage to the goods occurred while under the supervision of the defendant. *See, e.g., Bally,* 22 F.3d at 69–70; *Caemint Food,* 647 F.2d at 354.

■ The applicability of this second avenue is the key to the case before us. And, to a large extent, appellants' various attacks on plaintiff's case miss the mark, because they are grounded in the erroneous assumption that the plaintiff is required to rely on the first approach, *i.e.,* on evidence directly pertaining to delivery and outturn, to make out

its prima facie case. For example, appellants attack the bill of lading as establishing only "apparent" good condition at delivery, and argue that plaintiff cannot, on the facts before us, invoke the clean-bill-of-lading presumption. But, even if true, this would be beside the point. For the court below quite correctly found that the nature of the damage—seawater wetting—was of the sort that inexorably justified the conclusion that the injury occurred at sea.

Under the circumstances, we will not engage in fanciful assumptions that the harm might possibly have occurred outside the defendants' control. Suggestions of bizarre occurrences (for example, that the shipper paid to transport already damaged rolls of paper), and conjectures unsupported by evidence need not detain· us. As a result, defendants' challenge to the condition of the cargo at delivery is not only inapposite, but unavailing. *See Arkwright Mut. Ins. Co. v. M.V. Oriental Fortune,* 745 F.Supp. 920, 923 (S.D.N.Y.1990) ("Indeed, the condition of the cargo upon outturn and the type of damage sustained can be such as to mandate a finding that the cargo was in good order upon shipment.") (citing, *inter alia, Caemint Food,* 647 F.2d at 351 (canned corn beef)).

■ For similar reasons, we reject the appellants' second attack on plaintiff's prima facie case. Appellants claim that plaintiff has failed to show outturn in damaged condition. They contend that because plaintiff's notice of damage was belated, COGSA's presumption of discharge in good condition governs. But even· assuming, *arguendo,* that the good-outturn presumption applied against plaintiff, we would necessarily find that the presumption was rebutted by the nature of the damage to the goods— seawater wetting. Absent believable evidence to the contrary, such damage of itself establishes the fact that the goods were damaged during ocean transit and, hence, were not received unharmed. As a result, we need not become enmeshed in the intra-defendant wranglings over the scope of the bill· of lading.[7] (And, similarly, the trial judge's erro-

---

7. Sea-Land contends, for the first time on appeal, that the bill of lading was house-to-house,

and, thus, carried through all the way to the final destinations in Tennessee. At first· blush, this

neous reference to it as a "port-to-port" bill of lading is of no consequence.[8])

■ Appellants' final attack on the plaintiff's prima facie case also fails, but deserves some comment. Appellants contend that genuine issues of material fact render summary judgment inappropriate in this case. Because this argument, if valid, would be applicable to either type of prima facie case under COGSA, it is, in contrast to appellants' other contentions, apposite, though it too is ultimately unsuccessful.

The propriety of summary judgment in actions under COGSA has not received much attention in our circuit. A COGSA prima facie case, if unrebutted, compels judgment for the plaintiff. But what constitutes a "rebuttal" sufficient to avoid summary judgment? In fact, a defendant facing a summary judgment motion under COGSA can respond in three ways, each of which may or may not constitute an adequate answer.

First, in response to a plaintiff's motion for summary judgment, the defendant can do nothing, and simply argue that the plaintiff has not met its burden to make out a prima facie case. If the defendant takes this approach, however, and the court holds that the plaintiff's evidence does establish a prima facie case, the plaintiff would be entitled to summary judgment.

A second response would be to attack the plaintiff's evidence, and cast enough doubt on it to raise a genuine issue of material fact. For example, the defendant could raise questions about the plaintiff's witnesses' credibility. Or it could argue that the nature of the damage to the goods was not peculiarly maritime. While, strictly speaking, this would not be "rebutting" the COGSA prima facie case with affirmative evidence showing that the defendant fell under one of COGSA's specific exceptions, it is certainly a tactic that could, if enough of plaintiff's evidence were called into doubt, raise issues precluding summary judgment.

The third approach is to submit evidence (perhaps also in conjunction with an attack on the plaintiff's prima facie case) that the defendant meets one of the COGSA exceptions. (This is what the caselaw refers to when it speaks of a defendant's "rebuttal" of the prima facie case.) For example, the defendant could show that, notwithstanding the fact that the cargo sustained damage while the defendant had custody of it, the damage resulted from an act of God. *See* 46 U.S.C. app. § 1304(2)(d).

---

seems most unusual—not only was this the position taken by *plaintiff* (unsuccessfully) at trial, but also, if correct, it would eliminate the claim that plaintiff's notice of damage was untimely. Sea–Land makes this argument, conceding "loss" on the untimely notice point, in the hopes of achieving a different presumption, the so-called "last carrier" presumption. This rule presumes that the last carrier to transport cargo in a multi-staged voyage is responsible for damage to the shipped goods. *See Madow Co. v. S.S. Liberty Exporter*, 569 F.2d 1183, 1185 (2d Cir.1978). Even if we did not bar Sea–Land from taking this new position, we would find the result to which it would seem to lead—that the truckers who transported the containers from Charleston to Tennessee were liable for seawater wetting—to be both absurd and inapplicable. To the extent that the last carrier presumption is rebuttable, it would be rebutted in this case as a matter of law. Appellee engages in dry understatement when it states that "not a single case has been found in which a court held a railroad or a trucker liable for seawater wetting."

More to the point is OOCL's contention that the bill of lading only ran up to the time of discharge at Charleston harbor, and not for the six weeks of storage in port thereafter. The

suggestion is, of course, that seawater could have damaged the goods while in port. There are, however, three problems with this argument. First, OOCL was ultimately responsible for arranging the truck transport to Tennessee, and it would be odd for there to be a "hiatus" in the bill of lading (or between two mini-bills of lading) during which the company with which the shipper transacted to move its goods was not responsible for custody and care. Second, the explicit instructions on the bill "To Hold at Charleston Port" countenanced delay in the transportation of the containers, from which it seems proper to conclude, absent any evidence to the contrary, that OOCL anticipated remaining in control of the goods for some time post-discharge. Finally, again in the absence of any evidence to the contrary (such as the warehouse's collapse into the sea or, perhaps, a freak tidal wave), we are unwilling to speculate that seawater damage occurred anywhere other than at sea.

8. The bill of lading clearly states that the goods were to be picked up at Stenay, which is not a port. Therefore, the bill was house-to-house, or, possibly, "house-to-port" (if such a hybrid bill exists). *See supra* note 7.

The interaction of a motion for summary judgment with these three responses is not complicated. In fact, the treatment of a summary judgment motion under COGSA is no different from the way similar motions are dealt with in any other litigation. For the establishment of a COGSA prima facie case—which is, after all, no more than a means of focusing attention on whether the cargo was damaged while in the custody of the defendant—entails no special considerations for summary judgment. As a result, a district court sitting in admiralty will, as courts regularly do, simply determine the existence of genuine issues of material fact.

Thus, if the defendant can show that plaintiff's prima facie case depends on resolution of disputed facts, then the court will set the matter for trial. *See, e.g., Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 860 (2d Cir.1985) (reversing a district court's grant of summary judgment against a defendant because the question of whether defendant's agent acted outside the scope of its authority in preparing an allegedly negligent travel plan was an issue of fact for trial). And, if the defendant can show that the plaintiff's prima facie case has been rendered completely meritless by the defendant's response, the defendant may even win a dismissal. On the other hand, if the defendant's evidence is so weak that it inflicts no meaningful damage to the plaintiff's prima facie case, the defendant will have judgment entered against it. *See, e.g., id.* at 859–60 (affirming summary judgment for plaintiff on the ground that "vague and conclusory references" did not create a factual dispute for trial concerning local stowage customs—which practices would have to be proven under COGSA to justify on-deck cargo stowage).

Before the district court, defendants in the instant case tried, albeit unsuccessfully, to employ a combination of the first and second approaches. They began by suggesting that the plaintiff had not made out a prima facie case at all, and then asserted that elements of the plaintiff's case rested on contested factual premises. On appeal, they make the same arguments.

They make reference to several "mysteries" in the case, and ask "questions" designed to cast doubt on plaintiff's prima facie case: How, if the containers were sealed and there was no pre-shipping inspection, did anyone know that the paper started out in good condition? What route did the containers take from Stenay to Antwerp? Why, if the damage was caused by "wicking," [9] did containers not on the floor of the cargo hold suffer damage? And, if the damage occurred on board the Inspiration, how does it happen that there was neither a notation in the log of flooding nor evidence of "tide marks" on the containers? "This evidence," they insist, "creates, at the very least, a genuine issue of material fact as to whether the damage occurred while the cargo was in the defendants' custody."

We disagree, and think that the district court was quite right in its conclusion that:

[t]he Defendants have failed to raise a material issue of fact as to whether the damage was caused by their negligence. The question of precisely how, where and when the damage occurred is irrelevant in the absence of some credible evidence that the damage was caused by something other than Defendants' negligence.

While Defendants may have may have raised an issue of fact as to precisely when and where the damage occurred, that issue is not a *material* issue of fact, as required to defeat summary judgment.

*Transatlantic Marine,* 961 F.Supp. at 59 (citations omitted).

■ Indeed, when a defendant chooses to ground its attack in disparagement of the plaintiff's prima facie case (rather than, for example, offering affirmative evidence proving that the damage did not occur while in the defendant's custody, or indicating that the injury fell under one of COGSA's exceptions to liability), it runs a heavy risk. While it is true that the burden is on the plaintiff to establish a prima facie case under COGSA, a

---

9. We deduce from our investigation of the record that "wicking" refers to situations in which water passes through one substance onto an adjoin-

ing substance. Wicking damage is to be distinguished from damage caused directly by flooding or leaks.

defendant must offer more than blanket assertions about mysterious possible causes if it is to survive a motion for summary judgment. The district court's judgment that plaintiff fulfilled its COGSA duty to create a prima facie case that the damage occurred to the goods while in the defendants' custody is without error and is, therefore, affirmed.[10]

*The Applicable Tariff*

■■■■■ Defendants are on firmer ground on the issue of whether Sea–Land's or OOCL's tariff applies to the bill of lading.[11] OOCL's tariff incorporates COGSA's default on limitation of liability: $500 per package (unless the shipper specifically declares and pays for excess value). *See* 46 U.S.C. app. § 1304(5). Sea–Land uses the significantly more generous "Hague–Visby Rules" (an international standard). Resolution of whose tariff applies requires delving into the bill of lading between OOCL and the shipper, which we do de novo.

Clause 1, headed "IDENTITY OF CARRIER," provides that "OOCL (U.K.) shall be deemed the Carrier for Goods transported (in either direction) between the North American continent and Europe/Mediterranean."

But the Bill of Lading allows for more than one "Carrier." And Clause 2 ("DEFINITIONS") provides that: " 'CARRIER' shall include the party on whose behalf this Bill of Lading has been signed, the Vessel, her owner(s), operator(s), demise, time, slot and space charterers or any person or entity to the extent bound by this Bill of Lading."

Thus, in addition to OOCL (who is defined as a Carrier in Clause 1 of the bill of lading),[12] The Inspiration (as the vessel) and Sea–Land (her owner and operator) are also Carriers. Of this there is no dispute.

TMCA contends, however, that Sea–Land—in addition to being a Carrier—was also what the bill of lading refers to as a "Participating Carrier." And, if this is so, it would be a matter of no small significance. Under the terms of the bill of lading, the tariff of the carrier identified in Clause 1, which is OOCL, governs at all times, except when the goods are in the custody of a "Participating Carrier."[13] Because Sea–Land's tariff incorporates the more generous Hague–Visby limitations on liability, TMCA argues strenuously that Sea–Land should be deemed *both* a Carrier *and* a Participating Carrier, and, hence, that its higher liability cap on damage to cargo should apply.[14]

But the definition of "Participating Carrier" (found in Clause 2 of the bill), on its face, suggests that an entity cannot be both a Carrier and at the same time a Participating Carrier. While "Carrier" is defined as "the party on whose behalf this Bill of Lading has been signed, the Vessel, her owner(s), operator(s), demise, time, slot and space charterers or any person or entity to the extent bound by this Bill of Lading," a "Participating Carrier" is defined, directly after this passage, as "any *other* water, land or air carrier performing a part of the carriage provided herein." (emphasis added). This disjunctive language indicates, and strongly,

**10.** Because we affirm summary judgment on the COGSA claim, we need not reach the district court's bailment analysis.

**11.** "Tariff" used in this context applies not just to the rates charged, but to the limitation on liability for damage to the goods.

**12.** "OOCL (U.K.) shall be deemed the Carrier...." Bill of Lading, Clause 1.

**13.** Clause 3 of the bill provides: "CARRIER'S TARIFF. The terms of the applicable tariff(s) of the Carrier identified in Clause 1 hereof are incorporated herein." Clause 4, however, informs that "The Carrier identified in Clause 1 hereof agrees to perform the ocean transportation.... [T]he Carrier agrees to procure trans-

portation of the Goods ... in accordance with its tariff(s) *and those of Participating Carriers ....* Each stage of the transport shall be governed according to any law and tariffs applicable to such stage. *The care, custody and carriage of the goods during any period in which a Participating Carrier ... is in possession of the goods shall be the sole responsibility of the Participating Carrier and not the Carrier.*" (emphasis added). Therefore, Clause 4 appears to "trump" the Carrier's tariff with that of the Participating Carrier when the latter is in charge of the goods.

**14.** The district court so found and, holding that "Sea–Land [was] thus both a carrier and a participating carrier," applied the "higher limitation" on liability that Sea–Land's tariff mandates. *Transatlantic Marine,* 961 F.Supp. at 60.

that Participating Carriers are entities other than Carriers.

TMCA seeks to rebut this seemingly normal interpretation by putting forward a syllogism that (in its opinion) shows how an entity can be *both* a Carrier *and* a Participating Carrier: The definition of "Carrier" includes the Vessel, and the prior definition of "Vessel" includes "the vessel(s) named in this Bill of Lading ... and any vessel, craft, lighter or other means of transportation whatsoever owned, chartered, operated or controlled and used by the Carrier *or Participating [C]arrier* in the performance of this contract." (emphasis added). Therefore, argues TMCA, a Participating Carrier, since it can operate a Vessel, can also be a Carrier.

▮▮▮▮ This argument is unavailing. Not only is it the less natural reading of Clause 2, but it also contravenes the obvious overall structure of the bill of lading.[15] Reading the bill as a whole, it is clear that Participating Carriers are entities that engage in the maritime practice of "feeder" and "through" carriage in inter-modal transportation contracts.[16] Clause 2 further employs the following definitions: " 'PORT OF LOADING' shall mean the place where the Goods are received for marine transport *by the Carrier*. 'PORT OF DISCHARGE' shall be the place where the Goods are to be discharged from *the Carrier's* vessel. 'PLACE OF RECEIPT' shall be the place where the Goods are received from the Merchant by *the Carrier, Participating Carrier* or their respective agents. 'PLACE OF DELIVERY' shall mean the place where the Goods are delivered by *the Carrier or the Participating Carrier* to the Merchant." (emphasis added). Had Sea–Land been involved between Stenay and Antwerp or Charleston and Tennessee, it might have been a Participating Carrier for that part of the journey. As the operator and owner of the Inspiration, however, it was merely a Carrier that OOCL (which was obligated under the bill of lading to "perform the ocean transportation between the Port of Loading and the Port of Discharge")[17] had arranged, through the VSAO agreement, to have transport the cargo.

Because we hold that Sea–Land was not a Participating Carrier under the bill of lading, it follows that its tariff—even for the portion of the trip during which it was the Carrier-in-custody of the goods—cannot apply.[18] We emphasize, however, that the use of OOCL's tariff, which incorporates the $500 per package limitation of COGSA, is eminently reasonable for several other reasons. First, the bill of lading contained a Clause Paramount: "All carriage under this Bill of Lading to or from the United States of America shall have effect subject to the provisions of COGSA ... which shall be deemed to be incorporated herein." Second, the shipper expressly declined to declare a higher value for the goods (and pay a correspondingly higher tariff), and, thus, should not receive the windfall of Sea–Land's higher liability cap.[19] Third—

---

15. We do not doubt that the bill of lading was, at best, awkwardly, and perhaps even ill-, drafted. But that fact does not render it ultimately any less clear as to this issue.

16. "Feeder" shipping is when an initial vessel, such as a barge, transports goods to the mother vessel for ocean transport. "Through" shipping is when a subsequent transporter, such as a trucker, takes goods from an ocean port to a final destination. And these terms are so used in the bill of lading before us.

17. This wording is poorly chosen. By using the word "perform," it implies that OOCL would physically carry the cargo on the ocean leg of the voyage. Taking the bill as a whole, and in light of customary practice, it is better to read "perform" as meaning "be responsible for the performance of," which, by availing itself to its VSAO agreement with Sea–Land, OOCL did.

18. TMCA's argument that Sea–Land is a "common carrier," and, thus, that Sea–Land's tariff applies for any leg of the journey during which it was a carrier of the goods—regardless of the terms of the bill of lading—is strained at best. We have held before that COGSA issues should be resolved by the parties' agreement. *See Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam"*, 759 F.2d 1006, 1016 (2d Cir.1985).

19. The *ad valorem* clause was on the front of the bill of lading, as was the disclaimer that the COGSA liability limit applied absent a declaration of higher value. The shipper declined to declare and insure excess value under this clause. *See generally Travelers Indem. Co. v. Vessel Sam Houston*, 26 F.3d 895, 900 (9th Cir.1994) (explaining why shippers generally do not declare excess value in bills of lading).

and most important in terms of effectuating the intents and understandings of the parties to the bill of lading, *see Spear, Leeds & Kellogg v. Central Life Assurance Co.*, 85 F.3d 21, 28 (2d Cir.1996) (counseling courts construing contracts to "ascertain and implement the reasonable expectations of the parties who undertake to be bound by its provisions"),—it is manifest in this case that the shipper had no reason whatsoever to believe that Sea–Land or its tariff would be involved. The shipper conducted its negotiations with (and pre-paid) OOCL, and it was on clear notice of OOCL's tariff and liability caps. That OOCL chose to "outsource" its ocean transport to another company should be of no import with respect to limitations on liability.

■ In reaching this conclusion, we in no way wish to undercut the principle that the drafter of a bill of lading (in this case OOCL) should be held accountable for the consequences of poor drafting.[20] We simply find that the bill of lading before us does not implicate a level of ambiguity sufficient to create a genuine problem of contractual interpretation.[21] We therefore hold that the COGSA liability limitation of $500 per package, as incorporated by OOCL's tariff, applies.

*Prejudgment Interest*

■ OOCL appeals the district court's grant of nine per cent per annum prejudgment interest. It cites 28 U.S.C. § 1961(a) in support of this contention. But § 1961 deals with *post* judgment, not *pre* judgment interest. We have made clear that in an admiralty case:

> The rule in this Circuit ... is that the rate of interest used in awarding *prejudgment* interest rests firmly within the sound discretion of the trial court. A plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations.

*Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 311 (2d Cir.1987) (emphasis in original) (internal quotation marks and citations omitted).

It follows that OOCL's reliance on § 1961, as barring the district court from exercising its discretion with respect to the interest involved, is mistaken. Moreover, if we construe OOCL's argument as a contention that the district court abused its discretion in fixing the prejudgment interest rate at nine per cent, we find no such abuse in the court's award.

*Conclusion*

This case has presented this court with a number of challenges—an awkward and complex bill of lading, changing and contradictory positions by the co-defendants on the scope of the bill, a plaintiff who presented so little evidence that as to most types of damage to cargo it would almost certainly have lost a motion for summary judgment, co-defendants who adverted to numerous fanciful "possibilities" and "questions," but provided no evidence supporting any of them, and inapposite citations to federal statutes. Under the circumstances, though we affirm only in part, we cannot fault the district court for its handling of the matter. We AFFIRM the summary judgment for plaintiff-appellee on its prima facie case under COGSA. We REVERSE the finding that defendant-appellant Sea–Land is a Participating Carrier and that its tariff covers the limitation on the defendants' liability for damages. And we REMAND with instructions to enter summary

---

**20.** Invoking the interpretive doctrine of *contra proferentum, see Navieros Oceanikos, S.A. v. S.T. Mobil Trader*, 554 F.2d 43, 47 (2d Cir.1977), would, however, be unusually problematic in this case because it would negatively affect not just OOCL, the drafter of the bill, but also Sea–Land, who was not involved in the drafting in any way at all.

**21.** Nor does it create a factual issue that must be resolved by a trial. As we have observed:

> As a general matter, we have held that when a contract is ambiguous, its interpretation becomes a question of fact and summary judgment is inappropriate. We have recently clarified this general rule to emphasize that ambiguity is not enough to preclude summary judgment. Rather, in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent. *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir.1994) (citations omitted).

judgment for defendants on the tariff issue, restricting liability to the $500 per package limit established by COGSA and OOCL's tariff. All other necessary aspects of the district court's judgment are hereby AFFIRMED.

SO ORDERED.