**GREAT AMERICAN INSURANCE CO., Plaintiff,**

v.

**USF HOLLAND INC., Defendant.**

**No. 11–CV–6879 (KBF).**

United States District Court, S.D. New York.

March 27, 2013.

Harold M. Kingsley, Kingsley Kingsley & Calkins, Hicksville, NY, Kevin Thomas Murtagh, New York Police Department, New York, NY, for Plaintiff.

William David Bierman, Thomas Christopher Martin, Nowell Amoroso Klein Bierman, P.A., Hackensack, NJ, for Defendant.

## MEMORANDUM DECISION & ORDER

KATHERINE B. FORREST, District Judge.

This case involves a shipment of animal vaccines that allegedly froze in transit, and the contractual relationships amongst the shipper, its insurer, and the motor carrier. Plaintiff Great American Insurance Company of New York, Inc. ("Great American"), the subrogated insurer of Novartis Animal Health US, Inc. ("Novartis" or "the shipper"), brought this action against defendant USF Holland, Inc. ("Holland" or "the carrier") on September 30, 2011. (Compl., ECF No. 1.) Plaintiff alleges that Holland is liable for the damaged vaccines under the Carmack Amendment, 49 U.S.C. § 14706. (*Id.* ¶ 4.)

The parties have cross-moved for summary judgment on the Carmack claim and its applicable limitation of liability. (ECF Nos. 48, 49.) In addition, plaintiff has moved *in limine* (ECF No. 45) to exclude the report submitted by defendant's proposed expert, Wesley Chused, Esq.

For the reasons set forth below, plaintiff's motion *in limine* is granted. Plaintiff's motion for summary judgment is granted in part and denied in part. Defendant's motion for summary judgment is also granted in part and denied in part.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the facts set forth below are undisputed.

*Contractual Agreements*

Three contracts governed the relationship between the shipper, Novartis, and the carrier, Holland, in February 2011—the time period relevant to this action.

First, the rates and basic terms of Novartis's shipments with Holland were governed by a master pricing agreement ("Pricing Agreement"), negotiated by Holland and a third party retained by Novartis. (Pl.'s R. 56.1 Stmt. ("Pl.'s 56.1") ¶¶ 38–41, ECF No. 51.) Novartis employees testified that during the negotiations leading up to the Pricing Agreement, Holland initially proposed to limit its liability for any damage to Novartis shipments to $10 per pound per piece, with a maximum per shipment liability of $100,000. (*See* Supplemental Decl. of Cindy VanVoorst ("VanVoorst Supp. Decl.") ¶¶ 6–7, ECF No. 31.) Ultimately, however, the parties agreed to a $25 per pound limitation with a cap at $100,000 per shipment; this is codified in the agreement. (*Id.*) However, the Pricing Agreement also contains a conflicting term in its General Terms and Conditions section, which limits liability to the lesser of $10 per pound per piece, or $100,000 per shipment. (*See* Def.'s Local R. 56.1 Stmt. ("Def.'s 56.1") ¶ 16; Pricing Agreement ¶ 5(i), Martin Decl. in Suppt. of Def.'s Mot. for Summ. Judg. ("Martin Decl."), Exh. C, ECF No. 48.)

The Pricing Agreement refers to a second tariff that applies to a number of special shipping services: the "Holland 100 Special Services Schedule" ("SSS"). (*See* Def.'s 56.1 Stmt. ¶ 15; Holland 100 Special Services Schedule ("SSS"), Murtagh Decl. Ex. 6, ECF No. 65.) The SSS lists various services including, *inter alia*, Guaranteed Delivery by a specified time ("Guaranteed Delivery"), and "Protect from Freeze". (SSS at 6–8, 41–42.) The Guaranteed Delivery service is not available for "any shipment that requires protective service,"

such as "Protect from Freeze" service. (*Id.*)

The SSS also includes a more restrictive limitation on liability than that included in the Pricing Agreement. For shipments using the Guaranteed Delivery service, Holland's liability for failure to deliver within the specified window is limited "to cancellation or refund of all shipment charges." (*Id.* at 6.)

The final applicable contract is the bill of lading. Each time Novartis sent a shipment via Holland, a Novartis employee would generate a bill of lading by filling out a form on the Holland website. (*See* Pl.'s 56.1 ¶ 10.) The Novartis employee would fill in a number of pre-printed fields before printing the document.

The bill of lading, relevant to the shipment at issue herein, contains several material terms: first, it incorporates the Pricing Agreement. (*See* Pl.'s 56.1 ¶ 36; Def.'s 56.1 Resp. ¶ 36.) Next, it also states that "freight moving under this bill of lading is subject to the provisions of [the SSS]." (*See* Bill of Lading, Martin Decl., Exh. A.) Third, the bill of lading expressly warns that "liability limitation for loss or damages on this shipment may be applicable", based upon additional services ordered. (*Id.*) Lastly, the bill of lading also provided spaces for the shipper to specify the quantity, type, weight and declared value of the cargo. (*Id.*)

*Vaccine Shipment*

The facts surrounding the shipment at issue are straightforward. First, it is undisputed that on the morning of February 7, 2011, Holland's Director of Claims Prevention emailed a group of customers, including Novartis. The email states:

> Due to severe winter storms that impacted much of our network last week, the following suspensions for Holland's Protective Service for freezable ship-

ments and Holland's Special Service offerings originating from or destined to the following states & services center (sic) is in effect for today—Monday, Feb. 7, 2011 [listing states, including Iowa and Illinois].

(*See* Pl.'s 56.1 ¶ 19; Email of Vickie Visser, Feb. 7, 2011, Martin Decl., Exh. G.)

It is also undisputed that on February 7, Novartis hired Holland to transport 11 pallets of vaccines with an invoice value of $125,579 from its facility in Larchwood, Iowa to a freight forwarder in Wood Dale, Illinois. (*See* Pl.'s 56.1 ¶¶ 3, 4.) To initiate the shipment, Novartis' International Shipping Coordinator. John Sanderson, generated a bill of lading via Holland's website. (*Id.* ¶ 10.) He described the cargo as 11 pallets of "vet medicine". (*Id.* ¶ 18.) He affixed a Holland "Guaranteed Delivery" sticker, requesting delivery before noon on February 8. (Def.'s 56.1 ¶ 14.) In the Special Instructions/Comments field, Sanderson wrote, "Rush Perishable Product-must be delivered by noon on 2/8/11." (*Id.* ¶ 11.) Finally, the bill of lading includes a handwritten notation listing the freight charge for this shipment as $320.05. (*Id.*) Sanderson did not request Holland's "Protect from Freeze" service (Def.'s 56.1 ¶ 20; Pl.'s R. 56.1 Opp. Stmt. to Def.'s Mot. for Summ. Judg. ("Pl.'s 56.1 Reply") ¶ 20, ECF No. 63.), nor could he have in light of the undisputed fact that any shipment requiring "Protect from Freeze" service cannot qualify for Guaranteed Delivery service, as set forth above.

Novartis employees packed the vaccines in small boxes, then—as Sanderson observed—the employees transferred the boxes into large crates with gel ice packs designed to ensure that the vaccine remained between 35°–45° Fahrenheit throughout its shipment. (Pl.'s 56.1 ¶ 9; Def.'s 56.1 ¶ 46.) The crates were sealed and labeled on the exterior with orange stickers, stating "VACCINES–PERISHABLE PRODUCTS," and "DO NOT FREEZE." (Pl.'s 56.1 Reply ¶ 6.) The crates were then placed in a refrigerated area, whose temperature was maintained within a 35°–45° Fahrenheit range, until the Holland truck arrived to pick them up. (Pl.'s 56.1 ¶ 9.) Upon arrival, Holland's driver signed the bill of lading, making no notation of any damage to the goods. (*Id.* ¶ 8.) There is no indication in the record that the Holland driver opened any of the sealed crates or had Novartis's permission to do so. There is no evidence in the record that suggests that, while the shipment was still under Novartis's control, it was exposed to conditions which would or could have caused freezing.

Holland transported the shipment to its Wheeling Terminal near Chicago–O'Hare Airport, arriving in the late morning on February 8. (*Id.* ¶ 24.) The trailer containing the shipment remained outdoors at this facility overnight in below freezing temperatures. (*Id.* ¶ 25; Def.'s R. 56.1 Opp. to Pl.'s Mot. for Summ. J. ("Def.'s 56.1 Reply") ¶ 25, ECF No. 62.)

The next morning—February 9—Holland loaded the shipment onto a smaller truck for transport to nearby Wood Dale, Illinois, where it delivered the vaccines to freight forwarder, Geantos Trucking (Novartis's designee), around midday. (*Id.* ¶¶ 20, 27.) A Geantos employee signed the delivery receipt underneath a statement that the goods were received in good condition except as noted; the employee did not note any problems. (Def.'s 56.1 ¶ 18; Pl's 56.1 Reply ¶ 15.) Within a half-hour, however, Geantos employees inspected the shipment, opening boxes randomly to examine the vaccine bottles. (Pl.'s 56.1 ¶ 28; Def.'s 56.1 Reply ¶ 28.) Upon inspection, the vaccines were discovered to be frozen. (Pl.'s 56.1 ¶ 29.) Defendant admits that some portion of the vaccines were frozen

but points to a Geantos employee's testimony that some of the vaccines were in liquid form. (Def.'s 56.1 Reply ¶ 29.)

Geantos returned the shipment to Novartis in Iowa, where Novartis's agent, Crawford Claims Management Services, inspected it and determined it to be a complete loss. (*See* Second Supp. Decl. of Van Voorst in Support of Pl.'s Mot. for Summ. J. ("VanVoorst Second Supp. Decl.") ¶ 3, ECF No. 55.) Novartis destroyed the entire shipment. (*Id.* ¶¶ 4–5; *Id.* Ex. 3.) No evidence in the record suggests that a thawed vaccine, or one that was stored next to a frozen vaccine, is saleable.

Plaintiff Great American—Novartis's insurer—paid $135,091.47 to Novartis on its claim for the damaged vaccines. (Pl.'s 56.1 ¶ 50.) This figure included an invoice value of $125,579.86, with the remainder constituting incidental damages such as the costs of inspecting and destroying the damaged vaccine. (*Id.* ¶ 56.)

*Procedural History*

Plaintiff brought this subrogation action on September 20, 2011, seeking to recover from Holland amounts paid to Novartis. (Compl.) Plaintiff asserts claims for cargo damage arising under the Carmack Amendment, 49 U.S.C. § 14706, which applies to interstate shipments via motor carrier and preempts any state law claims. (*Id.* ¶ 6.) Holland moved for motion for summary judgment on the basis that this Court lacked subject matter jurisdiction.[1] That motion was denied on March 5, 2012. The Court ruled that plaintiff had adequately pled the minimum $10,000 in damages required for federal jurisdiction under Carmack. (ECF No. 16.) *See* 28

U.S.C. § 1337 (setting forth jurisdictional floor).

Holland and Great American each now move for summary judgment as to defendant's liability under Carmack and whether that liability is contractually limited. (ECF Nos. 48, 49.) In addition, plaintiff has moved to strike the report of defendant's proposed expert, Wesley Chused, Esq. (ECF No. 45.)

## II. STANDARD OF REVIEW

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of mate-

---

1. The Court converted this motion from a motion to dismiss to a motion for summary judgment to permit the consideration of evidence outside of the pleadings. (*See* Order, Jan. 25, 2012, ECF No. 26.)

rial fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citations omitted). Only disputes over material facts—*i.e.,* "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## III. DISCUSSION

### a. *Motion to Exclude Expert Report*

■ As an initial matter, plaintiff moves to exclude the report of defendant's proposed expert, Wesley Chused, Esq., on the grounds that his report consists of inappropriate legal argument. The Court agrees. Accordingly, the Court has not considered the substance of his report in rendering its decision on summary judgment herein.

■ "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if, *inter alia,* "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702(a). "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991).

Chused is an attorney with 38 years of experience in negotiating pricing agreements and representing parties to motor freight disputes. (Curriculum Vitae of Wesley Chused, Esq., Murtaugh Decl. in Suppt. of Mot. *In Limine* ("Murtaugh Limine Decl."), Exh. 1, ECF No. 47.) The Court has no doubt that he has a great deal of knowledge about such matters. Defendant seeks to qualify him as an expert with respect to common practice in motor carrier contracting. (*See* Def.'s Mem. of L. in Opp. to Mot. *In Limine* to Strike Expert Rept. at 2–3, ECF No. 58.) If he were simply proposed and in fact proffered opinions as an industry expert on industry practice, his report might well be acceptable. However, his report goes well beyond that.

The eight enumerated opinions in Chused's report essentially set forth his view as to the ultimate legal conclusions this Court should reach. For example, Chused states that "[t]he Plaintiff is bound by the terms of the Pricing Agreement between Holland and Novartis, the bill of lading and Holland's 100 Special Services Schedule." (Rept. of Wesley Chused, Esq. ("Chused Kept.") at 16, Murtaugh Limine Decl., Exh. 2, ECF No. 47.) The additional conclusions are similarly legal in nature. This type of opinion usurps the role of the Court and fact finder in this proceeding.

What little factual information included in Chused's report is not of the type that would be useful under Fed.R.Evid. 702(a). For instance, he states that "[t]ransportation contracts such as the parties' Pricing Agreement are very common in the LTL trucking industry." (*Id.*) Whether these contracts are common is irrelevant to this proceeding. Such statements do not assist the Court.

Accordingly, because Chused's report oversteps the basic role of an expert and also provides little useful, factual material, the Court grants plaintiff's motion *in limine.*

### b. *Prima Facie Case for Carmack Amendment Liability*

The Court next turns to the parties' respective arguments under the Carmack Amendment. 49 U.S.C. § 14706. As set forth below, summary judgment for plaintiff is appropriate on this basis.

■ Carmack provides that a motor carrier may be strictly liable for damage to cargo it moves in interstate commerce. Strict carrier liability applies only where the plaintiff first makes out a prima facie case of (1) delivery to carrier in good condition; (2) arrival in damaged condition; and (3) damages. *See Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.,* 616 F.2d 619 (2d Cir.1980) (*citing Missouri Pacific Railroad v. Elmore & Stahl,* 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964)). After the plaintiff makes out this prima facie case, the burden shifts to the defendant to assert one of several affirmative defenses (*e.g.,* act of God, the public enemy, act of the shipper, public authority, inherent vice or nature of the goods). *See Project Hope v. M/V IBN SINA,* 250 F.3d 67, 73 n. 6 (2d Cir.2001); *St. Paul Fire & Marine Ins. Co. v. Schneider Nat–Carriers, Inc.,* 03 CIV 5197 RMB/GWG, 2006 WL 522455, at *6 (S.D.N.Y. Mar. 3, 2006) (burden shifts to defendant to show affirmative defense once plaintiff makes out prima facie case). If defendant fails to meet this burden, liability is established under Carmack for "actual loss or injury to the property". *See id.* (*citing* 49 U.S.C. 14706(a)(1); *Project Hope,* 250 F.3d at 73).

Plaintiff argues it has proffered sufficient evidence to establish a prima facie case as to all three Carmack elements—delivery in good condition, arrival in damaged condition, and damages. Defendant cross-moves, arguing that plaintiff fails to submit sufficient evidence to create a triable issue as to *any* of the Carmack elements. The Court examines each Carmack element below.

### i. *Delivery in Good Condition*

■ First, plaintiff makes out a prima facie case of delivery of the vaccines by Novartis to defendant in good condition.

First, plaintiff suggests that Holland had an affirmative obligation to inspect the cargo on pickup; it is undisputed that the Holland driver did not note any exceptions on the bill of lading. Failure to note such exceptions, plaintiff argues, satisfies the requirement of delivery in good condition.

■ Plaintiff's evidence is not dispositive, however. It is true that "a shipper's burden of proving that the goods were delivered to the carrier in good condition may be satisfied by the proffer of a clean bill of lading for the shipment." *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83–84 (2d Cir.2004) (internal citations omitted); *see also Caemint Food. Inc. v. Brasileiro,* 647 F.2d 347, 352 (2d Cir.1981) (announcing same rule). However, the clean bill of lading rule applies only where "the cargo was packaged in a way that permitted its inspection by the carrier." *Security Ins.,* 391 F.3d at 83. "[W]here the contents of a shipment are not visible or open for inspection ... a clean bill of lading is not sufficient to establish delivery of the goods in good condition. Instead, when a carrier is prevented from independently inspecting cargo, the plaintiff must present additional evidence, either direct or circumstantial, in order to establish the initial contents and condition of the cargo." *Id.*

Here, the parties agree that the sealed pallets were loaded onto the Holland truck by Novartis employees. The record evidence does not clearly show whether Holland could have inspected them independently. Thus, the clean bill of lading does not automatically satisfy the first element

of the prima facie case. The Court must look to the "additional evidence, either direct or circumstantial," to evaluate delivery in good condition. *Id.*

To that end, plaintiff cites the Second Circuit's opinion in *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration,* 137 F.3d 94 (2d Cir.1998), for the proposition that plaintiff may satisfy the first Carmack element with a showing that the *nature* of the damage is such that the damage could only have occurred while the carrier possessed the goods. The *Transatlantic Marine* court upheld summary judgment as to the prima facie case[2] for plaintiff where the damage—water damage to a shipment of paper transported by boat—was of a nature that would only be caused by the shipment process. *Id.* at 99.

Here, plaintiff proffers unrebutted evidence to make out delivery in good condition based upon a "nature of the damage" theory. The instant case is similar to *Transatlantic Marine,* where no evidence in the record suggested that the type of damage—seawater infiltration—could have occurred at any time other than during shipment by boat. Here, no reasonable juror could find evidence in the record that the damage to the vaccines occurred other than by freezing in Holland's custody.

The only record evidence on this point consists of the deposition of Novartis's International Shipping Coordinator, John Sanderson. Sanderson testified that (1) Novartis's pre-shipment storage methods were designed to keep the vaccines at a temperature range between 35 and 45 degrees Fahrenheit and (2) that he personally saw the boxes of vaccines at issue being transferred directly from Novartis's climate-controlled warehouse to the Holland truck. (*See* Dep. of John Sanderson ("Sanderson Dep.") at 47, 126, Martin Decl. Ex. I, ECF No. 48.)

Defendant, in turn, fails to raise a triable issue to counter Sanderson's testimony. Defendant argues—but points to no scientific or other evidence—that the vaccines might have frozen because plaintiff packed the vaccines with gel ice packs (as set forth above, the gel packs were designed to maintain a constant temperature above freezing, at 35–45 degrees; defendant has proffered no evidence that the packs failed to work as designed).

Defendant also argues that because Sanderson admittedly did not observe the entire manufacturing and storage process of these particular vaccines, it is possible the vaccines froze while in Novartis's pre-shipment custody. Of course, anything is possible, but mere possibility is not enough to defeat a factual argument on summary judgment. On summary judgment, once a movant has put forward factual material in support of an argument, it must be countered with more than mere speculation. *See DiStiso v. Cook,* 691 F.3d 226, 230 (2d Cir.2012) ("A court cannot credit a plaintiff's merely speculative or conclusory assertions [on a motion for summary judgment]") (*citing Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008)).

Irrespective of whether Holland could have inspected the cargo before shipment, then, plaintiff satisfies the prima facie case as to shipment in good condition.

ii. *Arrival in Damaged Condition*

■ It follows from the above finding that because damage to the shipment did occur at some point, but no damage oc-

---

**2.** While *Transatlantic Marine* dealt with a claim under the Carriage of Goods by Sea Act, the burden-shifting analysis and prima facie case under Carmack are identical. *See Project Hope,* 250 F.3d at 73 ("[P]rima facie cases for both COGSA and the Carmack Amendment are identical for all relevant purposes.").

curred while in Novartis's custody, plaintiff also meets the second prima facie element of a Carmack claim: arrival in damaged condition.

Defendant argues that Novartis's agent signed the delivery receipt without noting any damage to the goods upon delivery; it argues the acceptance of the goods, without rebuttal testimony from the Geontis employee who signed the receipt, indicates that plaintiff cannot satisfy this element.

■ However, as with a clean bill of lading on departure, a clean delivery receipt merely establishes a presumption of good condition and is subject to rebuttal by evidence of damage. *See, e.g., C. Itoh & Co. (Am.), Inc. v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 597 (S.D.N.Y.1979) (noting that shipper's failure to give carrier timely notice of damage to cargo only provides a presumption of delivery in good condition). Such a presumption attaches here.

Plaintiff, however, proffers sufficient rebuttal evidence. The testimony of the freight forwarder employees who inspected the crates shortly stating that the condition of goods was damaged, along with photographs of frozen vaccine bottles allegedly taken around that time, is sufficient to rebut the presumption. Given the evidence of shipment in good condition, evidence of inspection shortly after arrival in damaged condition is enough. Indeed, this point hardly requires any inference other than the most obvious: there is no dispute that the goods were left overnight in sub-zero temperatures, outside in the Chicago winter.

That conclusion leaves open the extent of the damage to the vaccines, however. But the only evidence in the record is that the shipment left Novartis's warehouse in good condition, that the Geontis employees inspected the shipment shortly after arrival and found that at least some portion of

the vaccines were frozen, and that Novartis's inspectors determined the shipment to be a "complete loss" upon its return to Iowa. There is no evidence in the record to suggest that any portion of the vaccine shipment was saleable; defendant could have proffered such evidence by eliciting testimony that a thawed vaccine was useable, or that some portion of the vaccines had never frozen. Defendant points to no such evidence. Thus, the fact that the Geontis employees did not witness that all of the vaccines were frozen does not mean that all were not damaged. The record evidence is that they were exposed to damaging conditions; defendant has proffered no evidence that particular goods were undamaged, just that some were not completely frozen at the moment of inspection. On these facts, that is insufficient at this stage. (*See* Pl.'s 56.1 ¶¶ 28–32; Def.'s 56.1 Reply ¶¶ 28–32.) The only reasonable inference on the submitted evidence is that the shipment was, in fact, a complete loss.

### iii. *Damages*

■ Under Carmack, a plaintiff is entitled to recover the "actual loss or injury to the property caused by ... the carrier." 49 U.S.C. § 14706. Plaintiff has proffered evidence from its claims agent that the entire shipment was destroyed. Plaintiff is therefore entitled to a finding of both liability and damages.

### c. *Negligence Defense*

■ Defendant argues that, even assuming plaintiff can make out a Carmack Amendment claim, Novartis's own negligence in preparing and storing the vaccine shipment entitles defendant to summary judgment. On this record, this Court disagrees.

■ To assert the affirmative defense of shipper negligence, "[t]he burden [is] upon the carrier to prove that the loss or

damage arose *solely* from" that negligence. *See Lehigh Valley R. Co. v. State of Russia,* 21 F.2d 396, 405 (2d Cir.1927); *see also Project Hope v. M/V IBN SINA,* 96 F.Supp.2d 285, 294 (S.D.N.Y.2000), *vacated in part on other grounds, Project Hope v. M/V IBN SINA,* 250 F.3d 67 (2d Cir.2001). "It is of no avail to it to show that the shipper was in any way negligent, if the loss or damage would not have occurred, except for the concurring fault of the carrier." *Id.*

Defendant asserts that—even assuming the vaccines were damaged while in its custody—Novartis's negligence was the *sole* cause of any damage. In this regard, defendant points out the undisputed fact that Novartis failed to note on the bill of lading that the vaccines needed to be protected from freezing, or to include temperature recorders that would have warned the carrier of potential damage. Instead, Novartis decided to ship freeze-prone vaccines in the aftermath of severe snowstorms, and ignored the Holland email suspending Guaranteed Delivery and "Protect from Freeze" services for February 9. (*See* Def.'s 56.1 Stmt. ¶¶ 5–6.)

While these undisputed facts may show carelessness, plaintiff nevertheless defeats summary judgment as a matter of law. First, defendant does not automatically escape Carmack liability as a result of plaintiff's failure to request the Protect from Freeze service. *See Missouri P.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964) (declining to eliminate carrier liability even where shipper had superior knowledge and could have placed carrier on notice of fragile condition of cargo).

Nor does the record evidence raise a triable issue that plaintiff's negligence was the *sole* cause of the damage. It is undisputed that Novartis attempted to notify defendant that the vaccines were temperature sensitive: while Novartis failed to note "do not freeze" or list a temperature range on the bill of lading, it did place stickers on the crates specifying "do not freeze." (*See* Photo 18, Decl. of Julia Price in Supt. of Pl.'s Mot. for Summ. Judg., Exh. 1, ECF No. 52.) It also noted "Rush Perishable Product-must be delivered by noon on 2/8/11" on the bill of lading. (Pl.'s R 56.1 ¶ 11.) Defendant points to no evidence in the record to suggest that the stickers were not visible to the Holland personnel at the Wheeling Terminal, where plaintiff alleges the vaccines froze. Once defendant agreed to accept the shipment, it was charged with knowledge of the shipment's contents. *See, e.g., Levatino Co., Inc. v. S.S. President Hayes,* 233 F.Supp. 697 (S.D.N.Y. 1964) *aff'd* 337 F.2d 729 (2d Cir.1964) (holding that once defendant took custody of freeze-prone produce shipment it was "charged with knowledge of the characteristics of the cargo it accepted."). No reasonable jury could find that plaintiff's conduct was the sole cause of the damage. *See Fed. Ins. Co. v. Sabine Towing & Transp. Co., Inc.,* 783 F.2d 347, 350 (2d Cir.1986) ("[I]f the course of action chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have avoided further damage.")

Plaintiff's motion for summary judgment is granted, as to both the prima facie case of Carmack liability and defendant's negligence of the shipper defense.

### d. *Limitation of Liability*

█ There remains, of course, the fact that the parties' relationship was governed by various agreements—pursuant to which there were various limitations of liability. The contractual agreement between the parties is clear and unambiguous: liability is limited to the lesser of $25/lb. or $100,000.00 under the Pricing Agreement.

Both parties agree that the bill of lading incorporated the Pricing Agreement. (*See* Bill of Lading (noting cargo is "RE-CEIVED, subject to individually determined rates or contracts that have been agreed to in writing between the carrier and shipper.")) The Pricing Agreement is thus the default contract that governs this shipment. (*See* Def.'s 56.1 ¶ 15; Pl.'s 56.1 Reply ¶ 15.)

The Pricing Agreement contains a limitation of defendant's liability to a per-pound-per-piece rate capped at $100,000.[3] However, defendant argues that the SSS supersedes the liability limitation in the Pricing Agreement; the SSS limits liability to the shipping costs, here $320.05. (*See* Freight Bill, Vanvoorst Decl. Ex. 3, ECF No. 53.)

■■■ Whether the SSS limitation applies is a question of contract formation. The well-accepted rule is that a valid contract requires proof of an offer, acceptance, consideration, mutual assent, and the intent to be bound. *See Oscar Productions, Inc. v. Zacharius,* 893 F.Supp. 250, 255 (S.D.N.Y.1995).

Here, the plain language of the Pricing Agreement indicates that the SSS—an independent contract—only applies when special services are requested. (*See* Pricing Agreement at 3) ("All requests for additional services will be governed by the terms and conditions as provided in the Holland 100 Special Services Schedule").

Plaintiff contends that defendant never accepted its offer to purchase Guaranteed Delivery, a service governed by the SSS, so the limitation of liability in the SSS cannot apply. The Court agrees.

It is undisputed that defendant sent an email informing Novartis that it had suspended its special services offerings (including Guaranteed Delivery and Protect from Freeze service). In addition, the SSS states that the Guaranteed Delivery service is not available when the shipment requires freeze protection. (SSS at 6–8, 41–42.) When Novartis placed a Guaranteed Delivery sticker on the bill of lading, the sticker was merely an offer to purchase the Guaranteed Delivery service. It could not act as an acceptance on behalf of the shipper. There is no evidence in the record that defendant manifested acceptance of plaintiff's offer: it did not charge plaintiff for the service, nor did it attempt to deliver the shipment by noon the following day. (*See* Pl.'s 56.1 ¶ 49; Def.'s 56.1 Reply ¶ 49.)

As no party proffers evidence of defendant's acceptance of the Guaranteed Delivery request, the SSS did not govern the shipment and its limitation of liability does not apply.

■■■ Since the parties agree that the Pricing Agreement otherwise governed the shipment, its limitation of liability applies.[4] The exact limit found in the Pricing Agreement is disputed, however.

---

3. As discussed below, the Pricing Agreement contains conflicting provisions setting per-pound rates of $10 and $25, respectively. By its analysis below, the Court finds the $25/lb. rate to apply.

4. Plaintiff opposes any contractual limitation on liability under the "reasonable opportunity" doctrine, but this argument is without merit. According to that doctrine, "in order to properly limit its liability under the Carmack Amendment, a carrier must give the shipper a reasonable opportunity to choose between two or more levels of liability." *AIG Europe (Netherlands), N.V. v. UPS Supply Chain Solutions, Inc.,* 765 F.Supp.2d 472, 482 (S.D.N.Y.2011) (*citing Travelers Indem. Co. of Ill. v. Schneider Specialized Carriers, Inc.,* No. 04 Civ. 5307, 2005 WL 351106, at *5 n. 4 (S.D.N.Y. Feb. 10, 2005)). Here, the undisputed evidence of negotiations between the parties as to the limitations of liability in both the SSS and the Pricing Agreement leaves no

The Pricing Agreement contains two conflicting statements purporting to limit the parties' liability: first, the General Terms and Conditions section states that liability is limited to the lesser of $10 per pound or $100,000 per shipment. However, page two of the Pricing Agreement lists a limitation of $25 per pound, with a cap at $100,000 per shipment. Plaintiff argues that the $25 per pound limitation applies while defendant suggests issues of material fact remain.

██ "Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement, and where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." *See Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir.2010) (internal quotations omitted).

A holistic view of the competing clauses determines that the $25/lb. limitation applies. Holland is correct that ¶ 5(i) of the "General Conditions and Provisions" includes a $10/lb. limitation, but the language of that section indicates that it is boilerplate that the parties used to provide default terms. This conclusion is supported by the text of ¶ 5, which states that, "[t]he following limits of liability [*i.e.*, the $10/lb. limit] apply to all shipments hereunder *unless otherwise modified herein.*" (*See* Pricing Agreement at 4 ¶ 5 (emphasis added)). The "unless otherwise modified" clause mandates that the $25/lb. limit found earlier in the body of the Pricing Agreement is the controlling limitation. While the Court need not look to extrinsic evidence to support its conclusion, it notes

in passing that plaintiff submits evidence that the limit was negotiated from $10/lb. to $25/lb. by the parties, and that the "General Conditions and Provisions" did not receive similar consideration. (*See* Supplemental Decl. of Cindy Vanvoorst ¶¶ 6–7, ECF No. 31.) No material facts remain in dispute as to liability limitations; the lesser of $25/lb. or $100,000.00 applies.

## IV. CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Specifically, the Court finds that plaintiff has made out a prima facie case as to defendant's Carmack liability and is also entitled to summary judgment on defendant's negligence of the shipper defense. In addition the Pricing Agreement applies to the shipment here at issue as a matter of law. Under its terms, liability for the Novartis shipment is limited to the lesser of $25 per pound per piece, or $100,000.

Not later than *April 9, 2013. at 5:00 p.m.* the parties shall submit a joint proposed order of judgment consistent with this Decision.

SO ORDERED.

---

dispute of material fact as to reasonable opportunity; Novartis had such an opportunity. Given this finding, the Court will not address

plaintiff's arguments that it is entitled to the market value of the vaccines and incidental and consequential damages under Carmack.